# IN THE SUPREME COURT OF IOWA

No. 81 /07–0660

Filed November 6, 2009

**STATE OF IOWA,**

Appellee,

vs.

**RASHEEM DAMONTE BOGAN,**

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, J. Hobart Darbyshire, Judge.

A defendant appeals his conviction for first-degree murder. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Brian Farrell, Cedar Rapids, for appellant.

Thomas J. Miller, Attorney General, Bridget A. Chambers, Assistant Attorney General, William E. Davis, Scott County Attorney, and Amy Devine, Assistant County Attorney, for appellee.

**WIGGINS, Justice.**

A student appeals his conviction for first-degree murder. The court of appeals reversed the conviction and ordered a new trial because the district court failed to sever his trial from that of a codefendant. The State applied for further review, which we granted. On further review, we exercise our discretion and review whether the defendant should have received a *Miranda* warning prior to being interrogated at school. In our review, we find that the defendant was in custody at the time of the interrogation, and the police should have given him a *Miranda* warning prior to asking any questions. Accordingly, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.

## I. Background Facts and Proceedings.

On the evening of August 19, 2006, around 10:30 p.m., a young woman named Vincelina Howard was the victim of a drive-by shooting while attending an impromptu gathering at her grandmother's house in Davenport. Howard died due to hemorrhagic shock caused by the bullet injuries.

There was only one eyewitness as to the identity of the shooters. One man in the neighborhood saw a van driving slowly and observed the back-passenger-side sliding door open. He then saw gunfire from the van. The eyewitness saw four male African-Americans in the van, but did not recognize the individuals. Another eyewitness observed a "grayish silverish" minivan, but never saw the individuals inside the van.

The State's theory is that Howard's shooting was a gang-related retribution shooting. On April 19, 2006, Andrell Hearn was killed in Rock Island, Illinois. Allegedly, Davenport residents committed the homicide. Thereafter, on the 19th of every month, a memorial walk was held to remember Hearn. On August 19, a crowd of approximately 100 to 150

people gathered for a 6 p.m. walk. Afterwards, there was a barbeque party. Witnesses claimed both Rasheem Bogan and Don White, Jr. attended the walk and the gathering afterwards. The witnesses claimed the two men were at the gathering until at least 11 p.m.

Some time that same evening, possibly prior to the walk, Mark Helton placed Bogan at Ron Millbrook's house. Helton drove to Rock Island to drop off his van so Millbrook could borrow it for the evening. Millbrook was allegedly borrowing the van to move furniture. When Helton dropped off the van, there were approximately seven to eight people at the residence, including Bogan, White, and Millbrook. The witness to the shooting matched the van he saw to a photograph of Helton's van. Crime scene technicians found shell casings in Helton's van that matched one of the guns used in the shooting. The crime scene technicians also lifted one latent fingerprint from the window crank of the driver's-side door that matched Bogan's right thumbprint. Millbrook's and White's fingerprints were also matched to prints lifted from the van.

Later that evening, around 11 p.m. or 12 a.m., Timothy Smith saw Bogan at Millbrook's house. Bogan asked Smith to get him a room at a motel, and Smith did so. Smith came back to Millbrook's house, picked Bogan up, and took him to the motel around 12 or 1 a.m.

A few days after the shooting, on August 23, two Davenport detectives, Mark Dinneweth and John Hutcheson, went to Bogan's school in Rock Island to obtain his fingerprints and interview him. Bogan was fourteen years old at the time. A Rock Island detective, the school liaison officer, and the principal had already pulled Bogan out of class and placed him in the school office, where he was waiting. The principal called Bogan's father. Bogan's father came to the school. Detectives Dinneweth and Hutcheson, Bogan, and Bogan's father all went into the nurse's office for the interview.

The detectives did not give Bogan a *Miranda* warning before questioning him. Detective Dinneweth asked Bogan if he knew about the Howard homicide. Bogan replied he did not know anything specifically about it, but he did know Stevie West had called Terrell Lobley and accused Lobley and Bogan of perpetrating the shooting. Dinneweth then asked Bogan about his whereabouts that evening. Bogan answered that he was at the Andrell Hearn walk and then went to the barbecue. He stated he left the barbecue around 9:30 p.m. and went to Millbrook's house until 12:30 a.m. Then Smith escorted him to the American Motor Inn. This statement is at odds with the other witnesses' testimony as to Bogan's whereabouts at the time of the shooting. When asked where Millbrook was during this same time period, Bogan responded that Millbrook was there the whole time and he never saw him leave.

The police arrested Bogan for the Howard shooting. The juvenile court waived jurisdiction of Bogan. Bogan entered a written plea of not guilty. The police also arrested White, Millbrook, and Lobley for this shooting. White's trial ended in a hung jury and a mistrial, Millbrook was convicted of murder in the first degree, and Lobley was convicted of murder in the second degree.

The State filed a motion to try White and Bogan jointly. Bogan's attorney resisted the joinder and argued that if the cases were joined, Bogan would be prejudiced by bad acts evidence that was only admissible against White. Bogan also claimed he would look guilty by association. The court allowed the joinder, determining neither Bogan nor White would face prejudice by joinder of the common charges. Bogan also moved to suppress the statements he made to the detectives when they interviewed him at his school. The court denied this motion.

At the joint trial, the State offered testimony from several forensic scientists concerning the fingerprints of Bogan, White, and Millbrook.

Roughly twenty-five to thirty latent fingerprints were lifted off the van. One of the scientists identified Bogan's right thumbprint on the driver's-side door's window crank. The window crank did not have a knob. The scientist agreed it was reasonable to assume Bogan made the print while standing outside the door because it would be difficult for his right hand to reach across his body and touch the window crank if he was sitting in the driver's seat. The jurors had the opportunity to view the window crank position in person during a field trip to the van, which was near the courthouse. The State also introduced Bogan's statement. The rest of the testimony offered by the State dealt largely with guns linked to the Howard shooting found in a car previously owned by White, and currently owned by Millbrook.

The jury returned a verdict convicting Bogan of murder in the first degree. After denying his posttrial motions, the court held a dispositional hearing for Bogan. The court transferred Bogan's guardianship to the department of human services for placement at the State Training School at Eldora until shortly before his eighteenth birthday. At that time, the court stated it would hold a hearing to determine whether his youthful-offender status should continue after his eighteenth birthday, he should be sentenced for the crime of murder in the first degree, or he should be discharged.

Bogan appealed. We transferred the case to the court of appeals. The court of appeals determined Bogan's trial should not have been joined with White's and reversed. The State applied for further review.

**II. Issue.**

When we consider an application for further review, our discretion allows us to review any issue raised on appeal, regardless of whether a party seeks further review of that issue. *In re Marriage of Ricklefs*, 726 N.W.2d 359, 361–62 (Iowa 2007). We choose to exercise our discretion and review

whether the district court should have suppressed the statements Bogan made to the Davenport detectives.

### III. Scope of Review.

Bogan claims the court should have suppressed the statements he made to the Davenport detectives because the detectives did not give him a *Miranda* warning prior to being interrogated. We review constitutional claims of a *Miranda* violation de novo. *State v. Miranda*, 672 N.W.2d 753, 758 (Iowa 2003). We make an independent evaluation of the totality of the circumstances, while deferring to the district court's findings of fact due to that court's opportunity to assess credibility. *Id.* This court considers both the evidence at the suppression hearing and the evidence introduced at trial. *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997).

### IV. Analysis.

The Supreme Court requires that before beginning a custodial interrogation the police must inform a suspect:

> he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 1630, 16 L. Ed. 2d 694, 726 (1966). We have said the requirement of *Miranda* to inform a suspect of his or her rights is more than a "mere procedural nicety or legal technicality." *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009).

The State acknowledges the detectives never read Bogan a *Miranda* warning, so the only question we must decide is whether he was entitled to receive that warning. *See Miranda*, 672 N.W.2d at 759. The State claims Bogan was not in custody during the questioning at the school; therefore, he was not entitled to receive a *Miranda* warning.

A suspect is in custody if the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150, 82 L. Ed. 2d 317, 335 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125, 103 S. Ct. 3517, 3520, 77 L. Ed. 2d 1275, 1279 (1983)). To determine if a suspect is in custody we look to whether the suspect was formally arrested or whether the suspect's freedom of movement was restricted to such a degree to be associated with a formal arrest. *Miranda*, 672 N.W.2d at 759.

To determine whether the suspect's freedom of movement was restricted to such a degree, we apply an objective analysis and ask whether a reasonable person in the defendant's position would have understood his situation to be one of custody. *Berkemer*, 468 U.S. at 442, 104 S. Ct. at 3151, 82 L. Ed. 2d at 336; *Miranda*, 672 N.W.2d at 759. A custody determination depends on objective circumstances, not the subjective belief of the officers or the defendant. *Countryman*, 572 N.W.2d at 557; *see Yarborough v. Alvarado*, 541 U.S. 652, 662, 124 S. Ct. 2140, 2148, 158 L. Ed. 2d 938, 950 (2004).

To make a determination as to whether Bogan was in custody, we use a four-factor test. *Miranda*, 672 N.W.2d at 759. These factors are

(1) the language used to summon the individual;

(2) the purpose, place, and manner of interrogation;

(3) the extent to which the defendant is confronted with evidence of [his] guilt; and

(4) whether the defendant is free to leave the place of questioning.

*Id.*

Considering the first factor regarding custodial status, we find the principal summoned Bogan to the school office at the direction of the school liaison officer and a plain-clothes Rock Island detective. The principal went

into the classroom to get Bogan and walked him to the school office. Officer Pauley, the school liaison officer, and detective Karzin, with the Rock Island Police Department, followed behind. Bogan did not volunteer to speak to the police and did not acquiesce. In fact, detective Karzin thought he heard Bogan say he was not going to talk to anyone. Bogan was then placed in the school office. For these reasons, the first factor tends to support the conclusion that Bogan was in custody.

As to the second factor, one of the purposes for bringing Bogan to the office was to detain him in order for the Davenport police to obtain a court order from an Illinois judge authorizing them to take Bogan's fingerprints. Bogan was brought to the school office. The office is configured as a suite. The suite consists of a waiting area in front of a counter. Behind the counter there is an open area where the office support staff work. Just behind the open area, there are two offices, one for the principal and one for the nurse. The nurse's office has its own restroom. The principal and the Rock Island officers placed Bogan in the open area of the office, behind the counter.

Another purpose for bringing Bogan to the office was to ask him some questions regarding the Howard shooting. Once Bogan was placed in the office, he had to wait for his father and the Davenport detectives to arrive. After the detectives and his father arrived, the two Davenport detectives, Bogan, and his father, all went into the school nurse's office so the detectives could question Bogan. One of the detectives asked Bogan if he had any information or knew anything about the Howard homicide. He also asked Bogan about his whereabouts that evening. Bogan answered these questions.

Before the detective could ask any more questions, he received a call concerning the court order for Bogan's fingerprints. At this point, the interview ended, and the Rock Island detective took Bogan to the courthouse

for a hearing on the requested court order. The interrogation itself was not overly aggressive even though the detectives took Bogan to an area of the school not generally accessible to the public.

The police officials never disclosed to Bogan their dual purpose for bringing him to the office. We determine whether a suspect is in custody by applying an objective analysis and ask whether a reasonable person in the defendant's position would have understood his situation to be one of custody. Accordingly, the second factor tends to be neutral in determining whether Bogan was in custody.

As to the third factor, the Davenport detective questioning Bogan did not confront him with evidence implicating him in the shooting. Thus, the third factor tends to mitigate a finding of custody.

Finally, as to the fourth factor, Bogan was escorted to the office by two armed police officers. The school liaison officer and the plain-clothes detective remained at the only door to the office waiting for the Davenport detectives to arrive. Bogan was allowed to enter the principal's private office and take candy from a dish the principal had available for students. The officers did not take Bogan's cell phone from him, and he was seen walking around the office trying to get a signal.

Although Bogan was allowed to roam freely in the office area behind the counter, armed police officers remained at the only exit. When Bogan asked if he could use the restroom, an officer told him to use the one in the nurse's office. The officers never told Bogan he could leave. If Bogan had asked to leave, we doubt the officers would have honored his request because one of the lead Davenport detectives had instructed the officers to hold Bogan at the school until they obtained a hearing to get his

fingerprints. Therefore, the fourth factor tends to support the conclusion that Bogan was in custody.[1]

In summary, Bogan was a student summoned to the school office by his principal and armed officers. The officers placed him in an area of the office not generally accessible to the public. Two armed officers stayed at the door to the office at all times. The officers did not allow him to leave the office to go to the restroom, but instructed him to use the restroom not generally used by students. He was taken to the office to be interviewed and

---

[1]Bogan claims that when a juvenile is involved, the juvenile's age should be considered as an additional factor to determine whether a reasonable person in the defendant's position would have understood his situation to be one of custody. Previously, we have stated that we can use age as part of the analysis in determining a defendant's custodial status. *State v. Smith*, 546 N.W.2d 916, 922–23 (Iowa 1996). However, subsequent to our decision in *Smith*, the Supreme Court decided *Yarborough v. Alvarado*, 541 U.S. 652, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004), which questions whether age is a factor to consider under a federal constitutional analysis.

In *Yarborough*, the court was asked to decide if the state court should have considered the fact that the defendant was five months short of his eighteenth birthday when he was questioned by the police in determining his custodial status. *Yarborough*, 541 U.S. at 656, 659–60, 124 S. Ct. at 2144–45, 2147, 158 L. Ed. 2d at 946, 948–49. There, the Supreme Court held that the state court did not incorrectly apply the law by refusing to consider the defendant's age. *Id.* at 667–68, 124 S. Ct. at 2151–52, 158 L. Ed. 2d at 953–54. Justice Kennedy, writing for a majority of the court, questioned whether a court should consider age in a *Miranda* custody analysis, because the test is meant to be objective. *Id.* at 666–67, 124 S. Ct. at 2151, 158 L. Ed. 2d at 953–54. Justice Kennedy's opinion stated that by adding the subjective factor of the defendant's age into the equation, the usefulness of the test to law enforcement is eliminated. *Id.* at 667–68, 124 S. Ct. at 2151–52, 158 L. Ed. 2d at 953–54.

Justice Breyer, writing for himself and Justices Stevens, Souter, and Ginsberg, found nothing in the law supporting the conclusion that the court could not consider the defendant's age. *Id.* at 673, 124 S. Ct. at 2154–55, 158 L. Ed. 2d at 957 (Breyer, J. dissenting). Justice Breyer went on to state that applying a reasonable person standard does not require the court to inquire into the defendant's subjective state of mind, but rather age is an objective circumstance known to the police at the time of the interrogation. *Id.* at 674–75, 124 S. Ct. at 2155, 158 L. Ed. 2d at 958 (Breyer, J., dissenting).

Justice O'Connor, a member of the majority, wrote her own opinion concurring with Justice Kennedy's opinion. *Id.* at 669, 124 S. Ct. at 2152, 158 L. Ed. 2d at 954–55 (O'Connor, J., concurring). There, she stated the defendant's age was not relevant to the custodial inquiry under *Miranda* because the defendant was almost eighteen at the time of the interrogation. *Id.* (O'Connor, J., concurring). However, Justice O'Connor did state, "[t]here may be cases in which a suspect's age will be relevant to the 'custody' inquiry under *Miranda*[.]" *Id.* (O'Connor, J., concurring).

We need not decide whether age is a factor to consider under a federal constitutional analysis because an objective application of the four factors without considering Bogan's age leads us to the conclusion that a reasonable person in Bogan's position would have understood his situation to be one of custody. Additionally, because Bogan's counsel failed to raise a claim under the Iowa Constitution, we will not decide what warnings are required under the Iowa Constitution or if age is a factor to consider in determining custodial status.

held until the court arranged for a hearing to obtain his fingerprints. The Davenport detectives took him to the nurse's office to conduct the interview. Neither the officers nor the detectives told Bogan he was free to leave the office. Based on these facts, a reasonable person in Bogan's position would have understood his situation to be one of custody. *See In re C.H.*, 763 N.W.2d 708, 713–16 (Neb. 2009) (holding a student was in custody under facts remarkably similar to the facts of this case). Thus, the officers should have given Bogan a *Miranda* warning before his interrogation. Therefore, we hold any statements made by Bogan at the school are inadmissible. Accordingly, Bogan is entitled to a new trial.

### V. Other Issues that May Arise on Retrial.

Although our holding regarding Bogan's failure to receive a *Miranda* warning is sufficient to dispose of this appeal, we will consider certain additional issues that may arise on a retrial.

**A. Joinder of Bogan and White.** When it filed its charges against Bogan and White, the State filed separate informations against each defendant. Prior to trial, the State filed a motion to join the two cases. The district court granted the motion and the defendants were tried jointly.

In Bogan's appeal, our court of appeals found that the court should not have tried Bogan jointly with White because the jury could have improperly used the bad acts evidence admitted against White to convict Bogan. In its decision, the court of appeals found the evidence against Bogan was "not overwhelming." We not only agree with the court of appeals' assessment, but find that the evidence against Bogan is even weaker with our decision to exclude his statements made to the detectives at his school.

Subsequent to the court of appeals' decision in *Bogan*, the court of appeals granted White a new trial due to the district court's error in admitting the prior bad acts evidence against White. *State v. White*, No. 07–

0664, 2009 WL 776529, at *5 (Iowa Ct. App. Mar. 26, 2009). The court said a limited amount of the prior bad acts evidence was admissible, although the most prejudicial prior bad acts evidence was not admissible on retrial.

On remand, if the State continues to insist that Bogan and White be tried jointly, the district court must reexamine its ruling allowing these defendants to be tried jointly in light of the decisions issued by our court in this case and the court of appeals in *White*. In doing so, the district court must apply the established law regarding joinder and severance.

The Supreme Court has stated that joint trials promote efficiency and serve the interest of justice by avoiding the scandal and inequity of inconsistent verdicts. *Zafiro v. United States*, 506 U.S. 534, 537, 113 S. Ct. 933, 937, 122 L. Ed. 2d 317, 324 (1993). However, the Supreme Court has also stated severance should be granted when a joint trial

> would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. Such a risk might occur when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant. For example, evidence of a codefendant's wrongdoing in some circumstances erroneously could lead a jury to conclude that a defendant was guilty.

*Id.* at 539, 113 S. Ct. at 938, 122 L. Ed. 2d at 325. It also is settled law that defendants are not entitled to severance simply because they have a better chance of acquittal in separate trials. *Id.* at 540, 113 S. Ct. at 938, 122 L. Ed. 2d at 326.

We have said that severing the trials of codefendants is required in two situations. *State v. Williams*, 574 N.W.2d 293, 300 (Iowa 1998). First, when "the trial is so complex and the evidence is so voluminous that a jury [would] be confused and [would not be able to] compartmentalize the evidence." *Id.* Second, when the evidence admitted by or against a defendant is so prejudicial to the codefendant that the jury will likely wrongly use that evidence against the codefendant. *Id.* These situations are referred to as the

"spillover effect." *State v. McFadden*, 443 N.W.2d 70, 71 (Iowa Ct. App. 1989). The Eighth Circuit Court of Appeals describes this potentially prejudicial spillover effect as guilt by association, which occurs when the evidence is so overwhelming against one defendant that it spills over onto the codefendant. *United States v. Flores*, 362 F.3d 1030, 1042 (8th Cir. 2004).

Therefore, on remand, if the State continues to insist that Bogan and White be tried jointly, the district court must determine if evidence admissible against White is so prejudicial to Bogan that the jury will likely wrongly use the evidence against Bogan. In doing so, the court needs to consider the evidence admissible against White and the lack of overwhelming evidence against Bogan.

**B.   Jury Instructions.**   Bogan raised, through an ineffective-assistance-of-counsel claim, that the district court's jury instructions contained error because they failed to require the State to prove the defendant acted with malice aforethought or with the knowledge that those he aided and abetted acted with malice aforethought. *See State v. Tangie*, 616 N.W.2d 564, 573 (Iowa 2000). The State agrees the jury should have been instructed on this requirement. Because we have already reversed Bogan's conviction on other grounds, we need not reach the issue of ineffective assistance of counsel. Nonetheless, the court will have an opportunity to instruct the jury properly on remand.

**VI.  Disposition.**

Because the district court failed to suppress the statements Bogan made to the police at his school, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**