# IN THE COURT OF APPEALS OF IOWA

No. 20-1503
Filed October 6, 2021

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**JAYMES ANTHONY STARK,**
　　　Defendant-Appellant.
_____

　　　Appeal from the Iowa District Court for Lee (South) County, John M. Wright,

Judge.

　　　A defendant challenges his conviction for third-degree burglary as a habitual

offender.　**REVERSED AND REMANDED.**

　　　Martha J. Lucey, State Appellate Defender, and Theresa R. Wilson,

Assistant Appellate Defender, for appellant.

　　　Thomas J. Miller, Attorney General, and Genevieve Reinkoester, Assistant

Attorney General, for appellee.

　　　Considered by Tabor, P.J., Greer, J., and Doyle, S.J.*

　　　* Senior judge assigned by order under Iowa Code section 602.9206 (2021).

**TABOR, Presiding Judge.**

A jury convicted Jaymes Stark of burglarizing an unoccupied vehicle. In challenging that conviction, he contends the district court should have excluded statements he made to investigating officers. Because we find Stark was in custody when he confessed to being inside the vehicle, and the officers failed to give *Miranda* warnings[1] before questioning him, the court should have granted his motion to suppress. We reverse his conviction and remand for a new trial.[2]

## I.  Facts and Prior Proceedings

In March 2020, Heather McKannan was working as a certified nursing assistant on the overnight shift at the River Hills Village retirement center in Keokuk. When she went outside for a smoke break around 4 a.m., she realized she might not have locked her car, a silver Chevy Impala. Looking across the back parking lot, she saw a man standing next to the Impala. As she walked to her car, he moved toward nearby dumpsters. Once inside her car, she noticed her pack of Marlboro No. 27 cigarettes missing from the middle console and two checkbooks gone from her purse. Fearing the intruder had taken her belongings, McKannan called the police.

Keokuk police officers Tanner Walden, Zeth Baum, and Joshua Marroquin responded to the call. Officer Walden discovered Jaymes Stark in the back parking lot.[3] Walden turned on the patrol car's "white LED scene lights, and an individual

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).
[2] Because the suppression issue is dispositive, we need not address Stark's claim that the district court abused its discretion in overruling his objection to alleged burden-shifting during the trial.
[3] Officer Marroquin first went to the front of the retirement center to speak with McKannan but later joined the other two officers in the back.

came out from behind a large AC unit on the back of the building matching the description given from the complainant." Officer Baum's body camera captured their conversation with Stark. Baum had a long acquaintance with Stark, reflected by the fact that they addressed each other by first name.

Officer Walden first confronted Stark about the report of a car burglary. Stark denied entering the Impala or taking McKannan's belongings. To verify his denial, Walden asked Stark to empty his pockets. When Stark did so, he set down an array of items on a retaining wall, including a marijuana pipe. Stark pleaded with the officers not to take him to jail, explaining that he recently had neck surgery. Officer Baum told Stark he was not going to take him to jail over drug paraphernalia. Stark expressed embarrassment and admitted to the officer that he was homeless.

Stark also worried that his actions would get his girlfriend Amber Swindler into trouble. Swindler also worked at River Hills, and Stark said he stopped by to see if she could give him a ride. Swindler drove a silver Kia Spectra. Stark claimed he mistook the Impala for the Spectra in the River Hills parking lot.

When questioned by Officer Baum at the scene, Stark continued to deny entering McKannan's car or taking her checkbook or wallet.[4] Another officer searched under a nearby air-conditioning unit and found a bottle of pills prescribed to Stark, along with a pack of Marlboro No. 27 cigarettes. Concerned Stark had taken other items from McKannan's car, Baum started this exchange.

> Baum: I'm trying to help you avoid going up to the jail tonight but you're not helping me here.

---

[4] The officers asked about a missing wallet, though at trial McKannan described having two checkbooks, one of which contained her credit cards and cash.

> Stark: What do you need from me, man?
> Baum: I need to know where that wallet and checkbook's at.
> Stark:  Honestly, I didn't take it, I promise man.

Officer Baum then told Stark that "somebody" saw him inside the vehicle, though McKannan had not reported that fact to police.  Stark asked again: "What do you need from me?"  The officer said: "I want to know where that stuff is."  Stark insisted: "I did not take anything out of that car."  Officer Baum then told Stark he understood he was in a tough spot, being homeless and having "a drug addiction to try to feed."

Eventually, Stark returned to the question: "What are you going to do for me so I don't have to go to jail tonight?"  The officer repeated: "I told you I want to know where that wallet and checkbook's at.  That's where we're at, man, I want her to have her stuff back."

It's then that Stark appeared motivated to confess.  He asked: "Can I say something that's not under *Miranda*?"  Baum replied: "I haven't given you a *Miranda* warning.  You're not under arrest at this point."  Stark started to ask, "so if I say something, are you going to . . ." but then paused, shook his head, and returned to his denials.  He said: "I didn't see a checkbook, I didn't rummage through nothing."  The officer seized on Stark's hesitancy, saying: "And you were just about to tell me something, because you asked about *Miranda* and stuff like that."  The officer then quipped, "Stuff doesn't just disappear into thin air."

Stark replied, "She has to know where it's at, tell her to look in the whole car."  Getting more and more emotional, Stark said: "It's in there.  It's in the car."  Baum asked: "Did you leave it in the car?"  And Stark finally answered: "Yes."  Baum followed up: "Where at in the car?  Where did you leave it at?"  Stark

confessed: "It's in the boot." Stark added that he thought he was in his girlfriend's car.

The officers then handcuffed Stark. When Stark asked if he was going to jail, Officer Baum advised he was still not under arrest. Baum then went inside the retirement center and accompanied McKannan to her car, now parked in front. At Baum's suggestion, she checked inside the boots that she left on the floorboard. As Stark predicted, she found her checkbooks inside one of the boots. She denied keeping her checkbooks there. McKannan also identified her pack of Marlboro No. 27 cigarettes among Stark's belongings seized in the parking lot.

After completing their investigation, the officers transported Stark to the police station. But rather than booking him into the jail that morning, Officer Baum issued him a citation with a court date. The State later charged Stark with a class "D" felony: burglary in the third degree of an unoccupied vehicle, second offense, as a habitual offender. *See* Iowa Code §§ 713.1, .6A(2), 902.8, .9 (2019).

Stark moved to suppress his statements to the police. The motion alleged he was taken into custody and interrogated by the officers. The motion also asserted a promise of leniency induced his statements. The State resisted, arguing Stark was not in custody when questioned. The resistance also disputed that Officer Baum made an improper promise of leniency.

After a hearing, the district court denied the motion without analysis:

> The Motion to Suppress is overruled. Without setting forth in greater detail, the Court concludes that the Defendant's statements were not made while he was in custody. Therefore, no Miranda warning was necessary. The Defendant's statements to officers may be used in the Plaintiff's case in chief.

A jury convicted Stark as charged. The district court sentenced him to an indeterminate fifteen-year prison term with a three-year mandatory minimum. He now appeals.

## II. Jurisdiction

We start our legal analysis by determining whether we can hear Stark's appeal. The district court entered judgment and sentence on November 9, 2020. Stark filed a pro se notice of appeal three days later. That step was problematic because he was still represented by his trial attorney. *See* Iowa Code § 814.6A (2020) (prohibiting persons who are represented by counsel from filing "any pro se document" in any Iowa court). Still, the district court certified the notice of appeal on November 13. The next day, the court appointed the state appellate defender to handle Stark's appeal.

In August 2021, the appellate defender filed a second notice of appeal and an application for delayed appeal. As his first line of defense, Stark argues his pro se notice was adequate to confer jurisdiction on our court despite the prohibition in section 814.6A. Yet he recognizes that we have dismissed an appeal when a represented applicant for postconviction relief filed a pro se notice. *See Boring v. State*, No. 20-0129, 2021 WL 2453045, at *3 (Iowa Ct. App. June 16, 2021) (addressing similar prohibition in Iowa Code section 822.3A). So Stark alternatively seeks a delayed appeal. *See State v. Anderson*, 308 N.W.2d 42, 46 (Iowa 1981) (granting delayed appeal where party "made a good faith effort to appeal and at all times clearly intended to appeal").

We asked the State for a response. The State argues the pro se notice of appeal was a nullity. But the State acknowledges Stark expressed his intent to appeal and made a good faith effort to do so by filing a pro se notice. The State admits the failure by Stark's trial counsel to ensure the notice of appeal complied with section 814.6A is the type of error that should be overcome by the grant of a delayed appeal. We agree and grant Stark's request for a delayed appeal.

### III. *Miranda* Violation

On appeal, Stark contends his incriminating statements to the Keokuk officers were inadmissible for two reasons: (1) he was subjected to custodial interrogation without *Miranda* warnings and (2) his statements were involuntary because Officer Baum made promises of leniency.

We can resolve this appeal on the alleged *Miranda* violation.[5] We review that constitutional claim de novo. *State v. Bogan*, 774 N.W.2d 676, 679–80 (Iowa 2009). That means we make an independent evaluation of the totality of the circumstances, while deferring to any findings of fact offered by the district court. *State v. Miranda*, 672 N.W.2d 753, 758 (Iowa 2003). Our deference is limited here because the district court offered no fact findings in denying the motion to suppress. And beyond the evidence from the suppression hearing, we may also consider the evidence introduced at trial. *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997).

---

[5] In its appellee's brief, the State asserts, "Although the record is somewhat unclear, arguably none of Defendant's arguments are preserved for appeal." We disagree. Stark brought up custody in his suppression motion. Likewise, the county attorney resisted, and the district court denied the motion on that ground.

At issue are the rights "now familiar to much of the American public." *Miranda*, 672 N.W.2d at 758–59. Suspects subjected to custodial interrogation must first be informed of their constitutional rights to remain silent and to have an attorney present during questioning. *Miranda*, 384 U.S. at 478–79. They must also be advised "anything [they say] can be used against [them] in a court of law." *Id.* And "if [they] cannot afford an attorney one will be appointed for [them] prior to any questioning" if they wish. *Id.* If police do not carry out this prophylactic measure, the evidence they obtain during a custodial interrogation is inadmissible. *Id.*

The State concedes the police failed to inform Stark of his *Miranda* rights before he confessed to entering McKannan's car. So the question before us is whether Stark was in custody and thus entitled to *Miranda* warnings before being questioned.

The *Miranda* safeguards "become applicable as soon as a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam)). The custody question is objective: how would a reasonable person in the suspect's position understand their situation? *Bogan*, 774 N.W.2d at 680 (explaining custody determination does not depend on the parties' subjective beliefs). To answer that question, we focus on four factors: (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the individual is confronted with evidence of guilt; and (4) whether the individual is free to leave the place of questioning. *Countryman*, 572 N.W.2d at 558.

Turning to the first factor, the record does not show the precise language the police used to summon Stark. But Stark did not volunteer to talk to these officers. Instead the police immediately took charge of his movement. *See Miranda*, 672 N.W.2d at 759. Officer Walden testified that when he illuminated the parking lot, Stark came out from behind an air-conditioning unit. In a show of authority, Walden parked his patrol car a few feet away and left his lights flashing, as he approached Stark on foot. Walden then told him to "stay where [he] was at and speak to Officer Baum." On this record, the first factor weighs toward custody.

As to the second factor, the police were there to determine whether Stark took items from McKannan's car. Even recognizing that purpose, the State characterizes the situation as an investigative stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and stresses that "the right to interrogate during a 'stop' is the essence of *Terry* and its progeny." *See State v. Scott,* 518 N.W.2d 347, 350 (Iowa 1994). Granted, "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *State v. Hillery*, 956 N.W.2d 492, 501 (Iowa 2021) (quoting *Maryland v. Shatzer*, 559 U.S. 98, 113 (2010)). But continued interactions may lead to a custodial interrogation requiring a *Miranda* warning. *Id.* (remanding for an evidentiary record whether Hillery's street-side confession violated *Miranda*).

Here, the purpose, place, and manner of the interrogation suggested a custodial atmosphere. Stark was outnumbered: three uniformed officers arrived to investigate a potential car burglary. During nearly twenty minutes of questioning, Officer Baum asked over and over what Stark was doing in

McKannan's car and where he put her checkbook. Police even asked Stark to empty his pockets.

True, the questioning occurred outside, but Stark had nowhere to go. They were in a secluded location behind River Hills. It was the middle of night and below freezing. And Stark was visibly cold, wearing only two sweatshirts against the twenty-degree chill. To quote Officer Baum: "It ain't like we're on Main Street." Granted, Officer Baum was professional and even somewhat empathetic toward Stark. But Baum didn't hide his disbelief of Stark's story and encouraged him to confess. Plus when Stark, likely hoping to avoid incrimination, asked to make a statement "that's not under *Miranda*," Officer Baum did not dispel Stark's confusion.

Which brings us to the third factor—the extent to which Stark was confronted with evidence of his guilt. Early in their encounter, the officer rejected Stark's claim that he was just waiting for a friend, saying: "Here's the problem Jaymes, we got a call saying a male matching your description was going through her vehicle."

Officer Baum also repeatedly confronted Stark with evidence of his guilt: "Listen Jaymes, we're past the point of you saying that you weren't in the vehicle. Somebody saw you in there. They saw you. Bro, they saw you in there. There's no getting around that. So we're past that point." But in actuality, McKannan testified she saw a person matching Stark's description "next" to her car, not inside it. That nuance was lost on Officer Baum, who declared: "She said she saw you in her car." This line of confrontational questioning would lead a reasonable person in Stark's position to believe he was not free to go.

Finally, on the fourth factor, the officers never told Stark he was free to leave. *See Bogan*, 774 N.W.2d at 681. After more than fifteen minutes of questioning, Stark implored Officer Baum: "I just want to go home man, I'll go home and I'll stay home." The officer deflected: "Jaymes, they saw you in the car, now there's stuff missing out of the car." Officer Baum acknowledged at the suppression hearing that Stark was indeed not free to leave at that point.

A few minutes later, after Stark made his incriminating statements and was being handcuffed, Baum still professed: "Like I said, you're not under arrest at this point, you're just being detained." As mentioned above, the officer's subjective view did not change the calculus. *See Countryman*, 572 N.W.2d at 557. The fourth factor supports the conclusion Stark was in custody.

In sum, considering the totality of circumstances and weighing the factors, a reasonable person in Stark's position would have felt their freedom was curtailed. And this infringement rose to a degree associated with formal arrest. Because Stark was in custody, officers should have given the *Miranda* advisory before questioning him. As a result, his incriminating statements were inadmissible. So he is entitled to a new trial.

**REVERSED AND REMANDED.**