# IN THE COURT OF APPEALS OF IOWA

No. 22-0687
Filed September 27, 2023

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**SHANE MICHAEL MORRIS,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Floyd County, James M. Drew,
Judge.

Shane Michael Morris appeals his convictions for involuntary manslaughter
and child endangerment resulting in death.  **AFFIRMED.**

Judith O'Donohoe of Elwood, O'Donohoe, Braun, White, LLP, Charles City,
for appellant.

Brenna Bird, Attorney General, and Martha E. Trout, Assistant Attorney
General, for appellee.

Heard by Bower, C.J., and Ahlers and Chicchelly, JJ.

**CHICCHELLY, Judge.**

Shane Michael Morris appeals his convictions for involuntary manslaughter and child endangerment resulting in death. He alleges five issues on appeal, contending the district court: (1) erred by denying suppression of evidence, (2) abused its discretion in its evidentiary ruling, (3) should have excluded the testimony of a State witness, (4) should not have excluded the testimony of a defense witness, and (5) abused its discretion in denying his motion for a judgment of acquittal and new trial. Upon review, we affirm.

## I.       *Background Facts and Proceedings.*

On an early morning in August 2019, three-month-old X.M. was left in the care of his father, Morris, when the child's mother went to work. The mother received a call within a couple of hours from Morris, instructing her to meet him at the hospital because X.M. was not breathing correctly. Once at the hospital, staff began doing life-saving breathing treatments to stabilize X.M. Because of the severity of his condition, he was transferred to Mayo Clinic in Minnesota. Upon arriving, medical professionals noticed a "big bump" on X.M.'s head and ordered further testing. The results of the testing showed a skull fracture and brain damage. He also sustained a torn frenulum and retinal hemorrhaging. It was around mid-afternoon the same day by the time parents were aware of the diagnosis.

While at Mayo, Division of Criminal Investigation agents interviewed both parents separately. Prior to being interviewed, Morris was unresponsive when asked what happened to X.M. But during questioning, which occurred at approximately 9:30 p.m. after Morris had been made aware of the mechanism of

X.M.'s injuries, he finally provided an explanation. He told officers he accidentally tripped while carrying X.M. towards the kitchen counter, heard a loud "thud," and fell on top of the infant. He re-enacted the fall for agents and consented to photos being taken of his person.

Meanwhile, X.M.'s condition worsened. Within one day of the accident, doctors told the parents X.M. had lost all brain function with no likelihood of recovery. He was removed from life support and died a short time later. After X.M.'s death, law enforcement obtained and executed two search warrants. Morris's cell phone, records, and Google history were the subjects of the searches. Following the investigation, Morris was charged with first-degree murder and child endangerment resulting in death.

During the proceedings, Morris filed two applicable motions. He sought to suppress evidence obtained from the search warrants, the interview held at Mayo, the autopsy report, and testimony from various medical experts. The district court denied these suppression motions. Morris also moved to exclude a prosecution witness and attempted to call his own witness to give testimony about his current parenting abilities. The district court allowed the State's witness to testify and excluded Morris's witness as irrelevant.

The jury ultimately convicted Morris of a lesser charge of involuntary manslaughter and child endangerment resulting in death. He was only sentenced on the child endangerment conviction based on Iowa's one-homicide law. Morris timely filed a motion for judgment of acquittal and new trial. On appeal, he now argues against the court's suppression rulings, the admissibility decisions relative to the two witnesses, and the denial of his posttrial motions.

## II.    District Court's Suppression Ruling.

First, Morris contends the district court erred when it denied his motions to suppress evidence in violation of his constitutional rights.  "We review determinations of whether to suppress both evidence obtained and statements made in violation of constitutional guarantees de novo."  *State v. Hillery*, 956 N.W.2d 492, 498 (Iowa 2021) (quoting *State v. Tyler*, 867 N.W.2d 136, 152 (Iowa 2015)).  "We look to the entire record and make an independent evaluation of the totality of the circumstances."  *State v. Storm*, 898 N.W.2d 140, 144 (Iowa 2017) (citation and internal quotation marks omitted).  "We give deference to the district court's fact findings due to its opportunity to assess the credibility of the witnesses, but we are not bound by those findings."  *Id.* (citation omitted).

The parties dispute whether error was preserved on this issue.  But Morris argued the issue and received an adverse ruling at the district court, preserving it for appeal.  *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012); *see also Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).  Therefore, we review it now.

### A. Suppression of Statements Made During Interrogation.

Morris argues that his un-*Mirandized* statements made while under custodial interrogation should be suppressed.  *Miranda* warnings are required when a suspect is subject to custodial interrogation.  *State v. Schlitter*, 881 N.W.2d 380, 395 (Iowa 2016), *abrogated on other grounds by* State v. Crawford, 972 N.W.2d 189, 197 (Iowa 2022).  "Custody occurs upon formal arrest or under *any other circumstances* where the suspect is deprived of his or her freedom of action in *any* significant way."  *Id.* (internal quotation marks omitted) (emphasis in original)

(quoting *State v. Ortiz*, 766 N.W.2d 244, 251 (Iowa 2009)).  We use an objective test to determine whether a reasonable person would feel free to leave, a relatively high standard.  *See State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009).  The court utilizes a four-factor test to determine whether a suspect is in custody:

> (1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of her guilt; and (4) whether the defendant is free to leave the place of questioning.

*Schlitter*, 881 N.W.2d at 395 (citation omitted).  Further, interrogation is defined by questioning tactics "that the police should know are reasonably likely to elicit an incriminating response from the suspect."  *Id.* (quoting *State v. Miranda*, 672 N.W.2d 753, 761 (Iowa 2003)).  The State does not dispute law enforcement's questioning of Morris is considered interrogation.  Therefore, if we find Morris was in custody for the purpose of interrogation, he is entitled to *Miranda* warnings.  *See id.* at 395–96.

Under the circumstances of this case, we find that Morris was not in custody.  Law enforcement used strategic tactics to confront Morris and elicit a confession, which goes in favor of finding him in custody.  But the other factors weigh heavily in favor of finding that Morris was *not* in custody.  Officers initiated the encounter by identifying themselves as DCI agents.  They also warned Morris prior to the interview that he was not under arrest and was free to leave.  In terms of the location, the interview was held in a public conference room in the hospital with the door unlocked.  While Morris claims he could not leave because he did not have a vehicle, his lack of transportation did not prevent him from declining the interview and leaving the conference room.  Morris also points to his unfamiliarity

with law enforcement and his vulnerable emotional state. But we do not base our review upon the defendant's subjective belief of freedom. Instead, we use an objective review analyzing the belief of a "reasonable person." *See Bogan*, 774 N.W.2d at 680. Under that standard, a reasonable person would have felt free to leave. Therefore, we reject the contention that Morris was in custody and subsequently entitled to *Miranda* warnings. The district court did not err when it determined statements Morris made during this interrogation should not be suppressed.

Morris additionally argues the consent exception does not apply because his statements were not voluntary. However, his argument hinges on Morris being held in custody and enduring a violation of his *Miranda* rights. Because we find Morris was not in custody at the time of the questioning, we similarly reject this claim.

*B. Suppression of Search Warrant for Cell Phone and Records.*

Next, Morris argues the U.S. Cellular search warrant was invalid on two theories. First, he contends the warrant application was overbroad and lacking probable cause. Probable cause is constitutionally required for a valid search warrant. *State v. Shanahan*, 712 N.W.2d 121, 131 (Iowa 2006) (citing U.S. Const. amends. IV). We make a "probability determination that (1) the items sought are connected to criminal activity and (2) the items sought will be found in the place to be searched." *Id.* at 131–32 (internal quotation marks omitted) (quoting *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997)). When deciding whether evidence should be suppressed, we use common sense "rather than a hypertechnical"

reading and "draw all reasonable inferences to support the judge's finding of probable cause." *Id.* at 132 (quoting *Gogg*, 561 N.W.2d at 364).

The warrant application based its probable cause determination on two cell phone calls between Morris and his live-in partner, which occurred between 7:30 and 10:00 the morning of the events. According to Morris in his interview with agents, the calls were about the event itself. The warrant affidavit states, "[b]ased on [ ] Morris using his Android cellular telephone to communicate with [his partner] about the incident, probable cause exists that [ ] Morris used his cell phone for additional communication regarding the incident." A common-sense analysis tells us the search warrant purported to find other communications relevant to the crime. The cell phone sought was also clearly in active use by Morris. This is supported by the affiant's explanation: "[C]ellular phones are often used before, and after criminal activity, by suspects, and family members, to communicate, conceal evidence, avoid apprehension, and coordinate versions of events during a police investigation, either orally or through text messages." The communications used to support probable cause were directly related to the homicide, as explained by Morris during interviewing. While Morris argues the recovered data does not prove he was the one using the phone, this is a credibility determination outside the scope of our probable cause analysis. *See id.* It was reasonable for a judge to find probable cause existed based on this relationship between the phone use and the potential for evidence. Therefore, the search warrant was valid. The district court did not err by declining to suppress evidence obtained as a result of the search.

Second, Morris argues the search was not timely executed and, therefore, any search conducted post-expiration was warrantless. The Iowa Code provides that "[a] search warrant shall be executed within ten days from its date [and] failure to execute within that period shall void the warrant." Iowa Code § 808.8 (2019). The search warrant in dispute was issued August 13, 2019 and executed within the statutory timeframe on August 19.

But Morris argues the search warrant was for the *communications* on the device rather than the device itself; for this reason, the actual inventory of the records should have been completed *before* the expiration of the warrant. However, there is no controlling authority that cites this proposition, and Morris makes no nonfrivolous argument for a change in the law. Therefore, we reject his assertions that the warrant execution was untimely and the district court erred in not suppressing the fruits of its search.

*C. Suppression of Search Warrant for Google Records.*

Next, Morris contends the Google search warrant was likewise invalid. First, he argues probable cause does not support the issuance of the warrant for the Google records. However, he makes arguments related to credibility, not probable cause. For this reason, we use a common-sense determination to find the warrant valid. His active cell phone use similarly supports the probability that there might be relevant searches regarding the incident on the device itself and linked to his Google account. Whether the jury finds this evidence credible is irrelevant to our analysis. Instead, we find there is sufficient connection between the affidavit and the evidence sought. The search warrant is supported by probable cause.

Second, Morris argues the length of time cited in this warrant was overbroad because it spanned from August 1, 2019 to September 1, 2019. This time period was limited to the weeks immediately before and following the homicide. This expressly follows the time specified by the affiant when applying for the warrant, who used his experience and training to select that general timeframe. Giving deference to the judge's finding of probable cause, we find this is an appropriate search parameter. *Shanahan*, 712 N.W.2d at 132. We therefore conclude the district court did not err when denying the motion to suppress the Google records on this basis.

Morris additionally argues the warrant execution was "extra-jurisdictional" and improper. While the State contests error preservation, we note that this issue was argued before the district court and specifically mentioned in its ruling. Therefore, we find the issue sufficiently preserved for appeal. On the merits, Morris asserts a violation of the Iowa Code section and related federal statutes, which requires search warrants be executed by peace officers. *See* Iowa Code § 808.5; *see* Electronic Communications Privacy Act, 18 U.S.C. § 2703(b)(A). Instead, he alleges that Google employees executed the search in violation of applicable law. He then claims the State's failure to comply with state law violated federal law, citing the Electronic Communications Privacy Act. *See* 18 U.S.C. § 2703(b)(A).

We disagree with his interpretation. The federal statute unambiguously allows these court-ordered computer search disclosures to be completed without the presence of an officer. *See* 18 U.S.C.§ 2703(g). The district court correctly

determined the officers executing the search complied with applicable laws. There is therefore no evidence supporting Morris's challenge. We affirm.

### III.    District Court's Evidentiary Ruling.

Morris next contends the district court abused its discretion by admitting and excluding certain evidence at trial. The admission of evidence is generally reviewed for an abuse of discretion. *State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable . . . [or] if it bases its conclusions on an erroneous application of the law." *Id.* (alteration in original) (quoting *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017)). But hearsay claims are reviewed for correction at errors at law. *State v. Dessinger*, 958 N.W.2d 590, 597 (Iowa 2021).

*A. Suppression of State's Theory of Causation.*

First, Morris contends the district court abused its discretion by allowing the State to change its main theory of causation. However, we find that this issue was not preserved for appeal. An issue is preserved when introduced and ruled on by the district court. *Lamasters*, 821 N.W.2d at 862. Motions in limine and other "procedural rulings" do not count as rulings sufficient for appeal unless they "reach[ ] the ultimate issue and declares the evidence admissible or inadmissible." *Thoren*, 970 N.W.2d at 621 (quoting *State v. Alberts*, 722 N.W.2d 402, 406 (Iowa 2006)). If a pretrial motion is denied, an objection must be made "at the time the evidence is offered at trial to preserve a challenge to the evidence on appeal." *Id.*

While Morris argues the causation issue as part of his pretrial procedural motions, it never reached the required finality. *See id.* He also neglected to object

at trial when the evidence was offered. As a result of pretrial motions, the parties and the district court clarified before trial that the State's causation theory was based on an external blow to the head. But when evidence related to a "shaking" theory was introduced at trial, no objection was made. Morris objected to the expert's qualifications (or lack thereof) as a head trauma specialist but did not take issue with the testimony itself. Nor did Morris object when similar "shaking" evidence was brought up with other experts. Morris explains that his lack of renewed objection was strategy-based because it would be "pointless." But this does not change the requirement that an objection must be made in order to preserve error. *See id.* Because Morris did not preserve error, we affirm the district court's ruling.

*B. Suppression of Expert Testimony.*

Second, Morris argues the district court abused its discretion by not suppressing testimony from the State's expert witnesses. He contends three experts gave improper testimony that was either not based on personal knowledge or not ordinarily relied upon by other experts. Expert opinion testimony is admissible when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. This opinion can derive from personal knowledge or information that "experts in the particular field would reasonably rely on." Iowa R. Evid. 5.703. Generally, cause-of-death determinations are based on an autopsy report or similar medical findings. *See Tyler*, 867 N.W.2d at 154–55. But, "there are circumstances when a medical examiner's opinions on cause or manner of death may assist the jury, even when such opinions are based in part on witness

statements or information obtained through police investigation." *Id.* at 162. The admissibility is flexible because the result "depends on the particular circumstances of each case." *Id.* An opinion based "primarily on the autopsy" is generally admissible because of the high likelihood it will assist the jury in making a decision. *Id.* at 163.

### 1. Dr. Bothun

During Dr. Bothun's examination, Morris objected to the expert's ability to opine on causation. Despite Bothun's admission that he was not a head trauma specialist, the district court allowed the testimony because it related to eye hemorrhaging and Bothun is an experienced ophthalmologist. Morris makes no argument that the testimony was somehow unrelated to Bothun's specialty. He also does not discuss why the district court should not have allowed the testimony. Because he has not laid a sufficient argument, we do not consider it here. *See* Iowa R. App. P. 6.903(2)(g)(3) (waiving issues that are inadequately argued).

### 2. Dr. Lin

According to Morris, Dr. Lin provided improper expert testimony because he made a credibility determination of Morris. Morris states Lin based his opinion on the evidence obtained by law enforcement, including Morris's recorded reenactment. While this evidence was considered as part of his expert opinion, his opinion was primarily based upon the autopsy results. His testimony was therefore likely helpful to the jury as a result. *See Tyler*, 867 N.W.2d at 162–63. We find no evidence that the district court abused its discretion by admitting Lin's testimony.

*3. Dr. Derauf*

Morris makes the same argument for Dr. Derauf—that he opined on Morris's credibility rather than provided proper expert testimony. While he also based his opinion in part on the reenactment and interview, he primarily focused on the autopsy, X.M.'s medical records, and his own consultation. This is testimony that would likely assist the jury. *See id.* For this reason, we find the district court did not abuse its discretion by admitting his testimony on this matter.

Morris also claims causation testimony similar to Bothun was given by Derauf despite a lack of expertise to do so. But Morris does not specify what statements he believes are at issue nor why Derauf was not qualified to opine on the matter. Therefore, we do not consider his argument. *See* Iowa R. App. P. § 6.903(2)(g)(3).

Similarly, Morris seeks to argue two additional grounds: (1) that improper hearsay testimony was offered by Derauf because he was not a treating physician and therefore no hearsay exception applies; and (2) that the district court should not have allowed Derauf to opine on X.M.'s bruising and whether it was indicative of child abuse. However, these claims were made as a list of objections to the district court's eventual rulings. Morris provides no additional analysis, argument, or authorities to support these claims. Because he did not adequately argue these issues, they also are not considered on our review. *See id.* § 6.903(2)(g)(3).

*C. Suppression of "Foreign" Autopsy Report.*

Third, Morris argues the autopsy report is inadmissible hearsay. He also takes issue with the autopsy report being "foreign" because it is outside the scope

of applicable Iowa law.[1]  While we find that this challenge is preserved, we do not find it sufficiently argued.  Morris provides no analysis or argument to support either assertion.  He also fails to explain why the district court allegedly erred in admitting hearsay evidence.  Therefore, we find no errors by the district court to correct.  We affirm the admission of the autopsy report into evidence.

Lastly, Morris points to one specific exhibit photo as irrelevant.  The photo depicts the frenulum injury X.M. sustained.  Morris alleges it is a non-fatal injury and, therefore, not relevant to the charges.  But he similarly neglects to cite any applicable authorities or make further argument.  For this reason, we disagree with his argument and find the district court did not abuse its discretion in admitting the photo.

*D. Suppression of Recordings Made During Interrogation.*

Finally, Morris contends the district court abused its discretion by admitting recordings of the Mayo interview with DCI agents.  While he cites authority, he makes no additional argument. He neither specifies which statements are at issue nor why the cited authority supports their exclusion.  Because no sufficient argument is made, we decline to consider this issue on its merits.  *See* Iowa R. App. P. 6.903(2)(g)(3).  Therefore, we affirm the district court's ruling to admit the recorded statements.

**IV.    Inclusion of State's Witness.**

Next, Morris argues the district court abused its discretion by allowing the State to call an untimely witness at trial.  Specifically, Morris alleges the State

---

[1] The autopsy itself and the accompanying report were both done in Minnesota.

strategically chose to add one of his witnesses as a "trial gimmick." Trial courts are given broad discretion to allow inclusion of late witnesses, with or without appropriate consequences. Iowa R. Crim. P. 2.19(3) ("If the prosecuting attorney does not give notice to the defendant of all prosecution witnesses (except rebuttal witnesses) at least ten days before trial, the court may order the state to permit the discovery of such witnesses, grant a continuance, or enter such other order as it deems just under the circumstances.") Morris provides no accompanying analysis to explain why the State's alleged trial strategy results in an abuse of discretion. Further, in his argument, Morris neglected to include a single authority to support his accusation. "Failure to cite authority in support of an issue may be deemed waiver of that issue." Iowa R. App. P. 6.903(2)(g)(3). Without legal support, we decline to consider Morris's argument. For these reasons, we affirm the district court's ruling to include the State's witness.

## V.    *Exclusion of Defense's Witness.*

Morris also argues the district court abused its discretion by excluding one of his offered witnesses. Morris sought to call Kimberly Lursen, who provided supervision for his interactions with his other son, to testify about his parenting ability. He claims this prospective testimony was the best alternative available because there were no appropriate witnesses to testify regarding his abilities with X.M.[2] The State resisted, claiming Lursen's testimony was irrelevant because the interactions she observed involved a different child and were too remote in time, occurring more than one year after the events.

---

[2] Morris presented multiple character witnesses that testified to his caregiving. However, there were no non-relative professionals able to testify on this point.

The test we use for admissibility of relevant evidence is whether (1) it "has any tendency to make a fact more or less probable" and (2) "[t]he fact is of consequence in determining the action." Iowa R. Evid. 5.401. "Whether the necessary minimum level of logical connection between the offered evidence and the fact to be proven exists is a legal question lying within the broad discretion of the trial court." *State v. Thompson*, 954 N.W.2d 402, 407 (Iowa 2021) (quoting *State v. Tracy*, 482 N.W.2d 675, 680–81 (Iowa 1992)). Evidence is too remote to be admissible when "the elapsed time is so great as to negative all rational or logical connection between the fact sought to be proved and the remote evidence offered in proof thereof." *State v. Buelow*, 951 N.W.2d 879, 885 (Iowa 2020) (citations omitted).

We find that Lursen's testimony is neither material nor probative for these specific charges. Her testimony purports to show Morris was a loving and patient parent with X.M.; however, his bond with another child does not establish this. Her testimony similarly does not impact the probability of Morris's guilt or innocence with a separate child. Further, the timing is of concern given Lursen's testimony would be based on observations made over one year following the events of this case. While Morris contends that post-crime evidence *can* be relevant and provides an example, he neglects to make any further argument. He specifically does not describe how the court should have exercised its discretion differently or how its decision was untenable. Because we find Lursen's proposed testimony to be irrelevant and inadmissible, we affirm the district court's ruling.

***VI.   District Court's Judgment of Acquittal and New Trial Ruling.***

Morris next argues that the district court should have granted his post-trial motions.   He moved both for a judgment of acquittal and new trial, receiving adverse rulings for each.   Finding both adequately preserved, we review each in turn.

*A. Motion for Judgment of Acquittal.*

At the close of evidence, Morris moved for judgment of acquittal.   On appeal, he now argues the evidence was insufficient to justify a conviction beyond a reasonable doubt on either count.   We review sufficiency-of-evidence claims for correction of errors at law.   *State v. Crawford*, 974 N.W.2d 510, 516 (Iowa 2022). We consider the evidence in the light most favorable to the State and affirm if the verdict is supported by substantial evidence.   *Id.*

*1. Conviction for Involuntary Manslaughter.*

The jury instructions provided that the State must prove all of the following elements of the lesser included offense of Involuntary Manslaughter:

> 1.  On or about the 3rd day of August 2019, the defendant recklessly committed the crime of assault against X.M.
> 2.  The defendant did the act in a manner likely to cause death.
> 3.  When the defendant committed the assault, the defendant unintentionally caused the death of X.M., a child.

He specifically argues the State failed to meet its burden on elements 1 and 2 because they failed to present evidence of recklessness or the manner of the act. Recklessness was defined for the jury as when someone "willfully disregards the safety of persons" and "conduct which is consciously done with willful disregard of

the consequences." This does not require intent to cause harm, but that "a person knows or should know a risk of harm to another [ ] is created."

Morris argues the only evidence claiming to establish recklessness was of him tripping and staying up late the night before the events; however, this was not the State's theory. Viewing the evidence in its favor, we find there is substantial evidence supporting the verdict. Recklessness is inferred from actions "with a higher degree of danger" that is "so obvious from the facts that the actor knows or should reasonably foresee that harm" is likely. *State v. Torres*, 495 N.W.2d 678, 681 (Iowa 1993). The State never purported to credit Morris's story; instead, they were arguing that it was *not* credible and something much worse had happened for X.M. to sustain the injuries he had. The State provided evidence to show X.M. died from blunt force trauma rather than a simple fall. The recklessness standard only requires that Morris be aware of the foreseeable dangers, not that he intended any harm. *See id.* A jury could infer that Morris was aware of what an external head blow would do to a small infant. Therefore, there is sufficient evidence to support a conviction for involuntary manslaughter. We affirm.

*2. Conviction for Child Endangerment Resulting in Death.*

The jury instructions for Child Endangerment Resulting in Death required the State to prove four elements:

> 1. On or about the 3rd of August 2019, in Floyd County, Iowa, the defendant was the parent or a person having custody or control of X.M.
> 2. X.M. was under the age of fourteen years.
> 3. The defendant acted with knowledge that he was creating a substantial risk to X.M.'s physical health or safety.
> 4. The defendant's act resulted in the death of X.M.

Morris argues the State did not meet its burden by proving the third element but only states it is impossible to meet because it is untrue.

Child endangerment is not a specific intent crime that requires the State to prove a wish to harm; instead, they must prove "the prohibited result may reasonably be expected to follow" from the actions. *State v. Folkers*, 941 N.W.2d 337, 340 (quoting *State v. Benson*, 919 N.W.2d 237, 244–45 (Iowa 2018)). "[I]t is the appreciation of the risk to the child or minor posed by one's conduct that creates criminal culpability under this statute." *Id.* (alteration in original) (quoting *State v. Millsap*, 704 N.W.2d 426, 430 (Iowa 2005)). The knowledge element may be proven by "reasonable inferences drawn from the circumstances surrounding the accident." *Id.* (quoting *Millsap*, 704 N.W.2d at 430).

Viewing the evidence in the State's favor, there is sufficient evidence to justify the conviction. Medical records and reports established that X.M.'s injuries were clearly fatal. Because of the severity of the injuries, the State's expert witnesses largely disagreed with the story Morris told to law enforcement. X.M. suffered from a skull fracture and other injuries which were not supported or explained by the narrative Morris provided. Morris was also made aware of the mechanism of injury (and what would ultimately be the cause of death) before describing his side of the story to authorities. With no explanation for how the injuries occurred, a jury could reasonably infer that Morris was not credible and X.M. was put at substantial risk under Morris's care. Further, the jury could find that Morris appreciated the risk based on the severity of the injuries and the evidence offered to show what must have occurred for X.M. to sustain such

injuries. *See id.* We find there is sufficient evidence for the conviction of child endangerment resulting in death.

While Morris further contends the jury did not understand the fourth element (and therefore the State did not meet its burden), we do not consider it. Morris again provides insufficient argument by neglecting to provide authority or explanation of his reasoning. *See* Iowa R. App. P. 6.903(2)(g)(3). Without additional dispute, his conviction stands.

*B. Motion for a New Trial.*

Morris's final argument is that the district court erred in denying him a new trial because it failed to apply the appropriate weight-of-the-evidence standard. Generally, we review district court's ruling on a new trial for an abuse of discretion. *State v. Ary*, 877 N.W.2d 686, 706 (Iowa 2016). But because Morris's argument is based on whether the court applied the proper standard, we review it for correction of errors at law. *Id.*

Under the weight-of-the-evidence standard, the district court must determine whether more "credible evidence" supports the verdict than not. *Id.* A motion under this standard acknowledges there is sufficient evidence to support a conviction. *Id.* Instead, the motion focuses on whether *more* evidence than not supports their side. *Id.* It relies on the judge to make credibility determinations and weigh the amount of evidence for each party. *See id.*

Based on the district court's ruling, it is clear the proper standard was used. The district court made credibility determinations when it opined that both sides' expert witnesses were reliable. Further, it found Morris less credible because his version of events was inconsistent and not fully supported by his own experts'

testimonies. Finally, the State's substantial medical evidence was discussed in regard to the skull fracture. Combined, the district court found the evidence supported the conviction and based its ruling on the correct standard. Therefore, the district court did not err when it denied the motion for a new trial.

## VII. Conclusion

Because the district court neither abused its discretion nor erred, substantial evidence supports the guilty verdicts, and the court used the proper standard in its ruling, we affirm Morris's convictions for involuntary manslaughter and child endangerment resulting in death.

**AFFIRMED.**