**IN THE COURT OF APPEALS OF IOWA**

No. 21-0923
Filed November 2, 2022

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**ZACKERY NELSON BASSETT,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Hamilton County, Amy M. Moore,

Judge (Trial), James A. McGlynn, Judge (Motions).


A defendant appeals his conviction for second-degree murder. **AFFIRMED.**


Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold,

Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney

General, for appellee.


Heard by Tabor, P.J., and Schumacher and Chicchelly, JJ.

**SCHUMACHER, Judge.**

Zackery Bassett appeals his conviction for second-degree murder. He claims the court improperly admitted bad-acts evidence, Bassett's statements to law enforcement, testimony from the medical examiner, as well as the victim's statements to law enforcement in violation of the Confrontation Clause concerning a prior act of domestic violence. He also claims the court should have granted his motion for a mistrial based on a portion of a witness's testimony. He challenges the sufficiency of the evidence. Finally, he contends the court should have granted his motion for a new trial based on juror misconduct. Finding no error, we affirm.

**I.     Background Facts & Proceedings**

A reasonable jury could determine the following facts presented in six days of testimony from twenty-five witnesses and from the admitted exhibits. Bassett and Andrea Sokolowski began their relationship in 2016 in Sioux City, where they met while Bassett was working as a traveling welder. They moved to Webster City in 2018 for his job. Sokolowski generally did not work outside the home, although she spent one evening a week as a bartender at a local establishment for a short period during the parties' relationship. But after Bassett became upset with Sokolowski because of her work, Sokolowski ceased employment at the bar.

Testimony was consistent that the two had a tumultuous relationship. Multiple friends testified at trial about past violence perpetrated against Sokolowski by Bassett, as well as the injuries they noticed Sokolowski sustained during the relationship. For instance, Jon and Jennifer, friends of Sokolowski in Sioux City, witnessed Bassett tackle her during an argument. Jennifer also witnessed Bassett strike Sokolowski's head with a sack of Gatorade bottles, leaving a knot and

bruising.  Jennifer testified about property damage Sokolowski suffered during her relationship with the Bassett.  Aaron Sokolowski, ex-husband of Andrea Sokolowski, testified about conversations he had with both Bassett and his ex-wife involving their frequent fighting.  He also observed Sokolowski to have bruises and a broken collar-bone.  Bassett later admitted he had caused the break to Sokolowski's collar bone.

Two Woodbury County sheriff deputies testified about an encounter with Sokolowski near Sioux City.  While buying coffee at a local gas station, the officers observed a distraught Sokolowski in a parking lot.  She informed them that she had a fight with her boyfriend, whom she refused to identify.  She told the officer her boyfriend had kicked her in the leg.  Sokolowski's boyfriend had since left the area and she refused to show the officers her leg.  One of the deputies obtained surveillance footage from a nearby hotel that showed the assault, while the other officer helped Sokolowski obtain her personal items from the motel room she shared with her boyfriend.  Based on the surveillance footage, the deputies ultimately identified, tracked down, and arrested Bassett.  He later pled guilty and was convicted of domestic abuse assault causing bodily injury.  The conviction resulted in a no-contact order (NCO) that remained in place between Bassett and Sokolowski while they lived in Webster City, including at the time of Sokolowski's death.  Evidence of the plea, conviction, and NCO was introduced at trial.

Text messages and phone calls on the day of Sokolowski's death demonstrate that Sokolowski wanted to end the relationship with Bassett.  Less than two hours before her death on September 22, 2018, Sokolowski sent text messages to Bassett, stating, "I am done" and "I am leaving."  Bassett called

Sokolowski seven times in six minutes and Sokolowski texted, "Guess you made me leave." Bassett called her four more times and Sokolowski answered the fourth of those calls at 10:06 p.m. Bassett called 911 less than an hour later, reporting that Sokolowski was unresponsive.

First responders arrived at the couple's apartment after Bassett's call. Paramedics and a Webster City police officer found an unresponsive Sokolowski near a couch. She was pale, had no pulse, and was not breathing. Paramedics attempted CPR, which Bassett informed dispatch he had been performing before the arrival of first responders. Paramedics eventually attached a Lucas device, used for performing chest compressions. Two attempts were made to intubate Sokolowski but both attempts were unsuccessful. During the second attempt, one paramedic applied "cricoid pressure" to Sokolowski's throat to provide a better airway. The paramedic who performed the pressure testified at trial to his application of the appropriate amount of pressure. The amount of pressure applied in the medical interventions was contested by Bassett at trial. Both medical experts testified that too much pressure could damage Sokolowski's airway.

As efforts to resuscitate Sokolowski continued to fail, she was transported to a local hospital. The nurse practitioner who treated Sokolowski testified that Sokolowski was in cardiac arrest. He also testified that Sokolowski had the most swollen airway he had ever seen. Bassett informed the nurse practitioner that he had been arguing with Sokolowski, went to bed, later heard what sounded like Sokolowski snoring, and then found her unresponsive fifteen to thirty minutes later. He also claimed to have attempted CPR, although paramedics informed the nurse practitioner that no one was performing CPR when they arrived. One paramedic

also testified at trial that there were no signs that anyone had performed CPR before their arrival.

While Sokolowski was receiving treatment at the hospital, Bassett spoke with the responding officer. Bassett told him that he and Sokolowski had been drinking and arguing. After she left, he went to his bedroom. Later on in the evening, he discovered her unresponsive on the couch. She looked blue and pale. He claimed to have performed CPR, called his mother, and then called 911. Sokolowski was pronounced dead that same night.

An associate medical examiner, Dr. Catellier, performed an autopsy on September 24. Her examination found petechiae—small hemorrhages of capillary veins that are caused when blood cannot drain back to the heart because of pressure—around Sokolowski's eyes, lips, and larynx. Some areas had florid petechiae, which are areas where several individual petechiae merge into a large hemorrhage. These can result from significant pressure. There was also a hemorrhage around Sokolowksi's right carotid artery. Some of Sokolowski's fingernails appeared broken and had coloration that indicated they may have been forcefully pushed back. She had a scratch on the back of her neck. Dr. Catellier ruled out accidental or natural death as the manner of death. She was suspicious that the injuries may have been caused by strangulation. Dr. Catellier requested further information from the paramedics about the pressure applied to Sokolowski's throat. She contacted the Department of Criminal Investigations (DCI). She also spoke with Sokolowski's friends and family, learning about the history of domestic violence. Her final report was issued January 31, 2019, which

listed the manner of death as undetermined and the cause of death as consistent with asphyxiation.

DCI agents began an investigation November 2, 2018. They conducted an interview with Bassett, which occurred in Kansas due to Bassett's work travel. The interview lasted about four hours and forty minutes. Bassett did not receive *Miranda* warnings. Contrary to the version of events he told first responders on the day of Sokolowski's death, during this November interview, Bassett informed DCI agents that Sokolowski suddenly lost consciousness as they were preparing to have sex. He informed investigators that her neck and shoulders were on the couch while he held her legs up to remove her pants when she lost consciousness. He consistently denied responsibility for her death. After executing a search warrant, which included Bassett's phone, he was allowed to leave. He was arrested a week later and charged with first-degree murder.

The defense moved to suppress statements Bassett made during his interview with DCI agents, which was denied as to all statements except those made during the execution of the search warrant. The defense also filed a motion in limine to exclude admission of prior bad acts and Dr. Catellier's testimony and report. The court issued a preliminary ruling as to the prior bad acts, but found Dr. Catellier's report and testimony admissible.

Trial began February 9, 2021. Bassett's defense focused on the possibility that the injuries were caused by medical interventions paramedics performed. He also claimed Sokolowski's death was caused by positional asphyxia—essentially the body's inability to obtain sufficient oxygen based on its position—that occurred when she and Bassett prepared to have sex. Part way through the trial, Bassett

moved for a mistrial based on the testimony of one witness who stated Sokolowski informed her that she hoped Bassett would not beat her or burn her property again. The court denied the motion. The jury returned a verdict on February 23, finding Bassett guilty of second-degree murder.

Bassett moved for new trial on March 25, based in relevant part on allegations of juror misconduct. Specifically, the motion and the juror's affidavit stated that a juror attempted the position with her husband that Bassett claimed Sokolowski was in when she lost consciousness. Two additional juror affidavits were filed containing vague recollections of the juror's statements and noted the jury foreperson quickly redirected the conversation. The court denied the motion for a mistrial.

Bassett appeals. He claims the court improperly admitted several instances of bad-acts evidence. He also alleges the court should have granted his motion for mistrial based on the witness's testimony about Bassett burning Sokolowski's property. Next, he claims the Woodbury County deputies' testimony about Sokolowski's statements violated the Confrontation clause. He contends the court should have excluded Dr. Catellier's testimony about conversations she had suggesting Sokolowski had a history of suffering from domestic violence. He also claims the court should have suppressed his statements to DCI agents. He contests the sufficiency of the evidence for his conviction. Finally, he requests a new trial based on juror misconduct.

## II. Prior Bad Acts Evidence

Bassett claims the court wrongly admitted testimony involving several acts of prior abuse he committed against Sokolowski. In particular, Bassett contests

the admissibility of testimony from Sokolowski's friends, Jennifer and Jon; the Woodbury sheriff's deputies who investigated Bassett for domestic abuse; evidence of his conviction for domestic abuse in Woodbury County; and testimony from the ex-husband of Sokolowski.

We review evidentiary rulings for an abuse of discretion. *State v. Thoren*, 970 N.W.2d 611, 620 (Iowa 2022). "A district court abuses its discretion when it bases its decisions on grounds or reasons clearly untenable or to an extent that is clearly unreasonable . . . [or] if it bases its conclusions on an erroneous application of the law." *Id.* (quoting *Stender v. Blessum*, 897 N.W.2d 491, 501 (Iowa 2017)).

Iowa Rule of Evidence 5.404(b)(1) (2021) prohibits the use of prior bad acts when used to prove someone's character or that they acted in accordance with that character. However, the evidence "may be admissible for another purpose such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Iowa R. Evid. 5.404(b)(2). When determining whether such evidence is admissible, we follow a three-step analysis. *State v. Putnam*, 848 N.W.2d 1, 8 (Iowa 2014). First, we examine "whether the evidence is relevant to a legitimate, disputed factual issue." *Id.* at 9. Second, there "must be clear proof the individual against whom the evidence is offered committed the bad act or crime." *Id.* (quoting *State v. Sullivan*, 679 N.W.2d 19, 25 (Iowa 2004)). Finally, we consider "whether the evidence's 'probative value is substantially outweighed by the danger of unfair prejudice to the defendant.'" *Id.* (citation omitted). We examine each step.

We must first determine whether the prior bad acts are relevant to a contested factual issue at trial. Bassett claims that his defense focused on whether

an act—an assault—ever occurred, not whether he had the requisite intent. *See Thoren*, 970 N.W.2d at 630 ("[E]ven if intent is an element of [an] offense, prior bad acts evidence is not relevant unless intent is actually in dispute."). We believe this misconstrues Bassett's defense. Bassett claimed that he did not strangle Sokolowski, but lifted up her legs to take off her pants, after which she immediately lost consciousness. As a result, he claimed she died from positional asphyxiation. That has a strong ring of claiming the death was an accident—that is, that he lacked the intent to murder Sokolowski when he lifted her legs.[1] *See State v. Newell*, 710 N.W.2d 6, 22 (Iowa 2006) (noting that the defendant's portrayal of events as an accident indicated intent was relevant in a murder trial); *cf. State v. Richards*, 809 N.W.2d 80, 95 (Iowa 2012) ("[The defendant's] denials that he was the perpetrator put at issue all the elements of the offense"). Thus, intent was a contested fact question at trial.

"Evidence is relevant if: a. It has any tendency to make a fact more or less probable than it would be without the evidence; and b. The fact is of consequence in determining the action." Iowa R. Evid. 5.401. We have little difficulty ascertaining that prior acts of domestic violence are relevant here. Our supreme court has repeatedly held that prior acts of domestic violence are relevant to intent, motive, and lack of accident. *State v. Taylor*, 689 N.W.2d 116, 125 (Iowa 2004); *Newell*, 710 N.W.2d at 21; *Richards*, 809 N.W.2d at 93. As explained in *Taylor*:

> We also think there is a logical connection between a defendant's intent at the time of a crime, when the crime involves a person to whom he has an emotional attachment, and how the defendant has reacted to disappointment or anger directed at that

---

[1] We also note that Bassett contests on appeal the sufficiency of the evidence related to his intent.

person in the past, including acts of violence, rage, and physical control. In other words, the defendant's prior conduct directed to the victim of a crime, whether loving or violent, reveals the emotional relationship between the defendant and the victim and is highly probative of the defendant's probable motivation and intent in subsequent situations.

689 N.W.2d at 125. Thus, the prior bad acts are relevant here.

The State must establish clear proof that Bassett committed the bad acts. Clear proof does not require that the events be proved "beyond a reasonable doubt, nor is corroboration necessary." *Id.* at 130. "There simply needs to be sufficient proof to 'prevent the jury from engaging in speculation or drawing inferences based on mere suspicion.'" *Id.* (citation omitted). "Testimony of credible witnesses can satisfy the clear-proof requirement." *Putnam*, 848 N.W.2d at 9.

Clear proof exists here for some of the acts. First, one Woodbury deputy testified that he reviewed surveillance footage that showed Bassett dump Sokolowski's clothes in a parking lot and Bassett kick Sokolowski. Bassett was ultimately convicted of domestic abuse causing bodily injury after pleading guilty to the offense. Both Jennifer and Jon witnessed Bassett tackle Sokolowski. Similarly, Jennifer witnessed Bassett swing a sack with Gatorade bottles at Sokolowski's head, leaving a knot and bruising. While this Gatorade event was somewhat remote in time from the instant offense, such goes to the probative value of the evidence, not whether clear proof establishes the event transpired. And Sokolowski's ex-husband testified that he spoke with both Sokolowski and Bassett about their violent relationship. Bassett admitted to breaking Sokolowski's collar bone.

We next turn to the other objectionable statements. First, Jennifer's testimony related to property damage, such as slashed tires and broken personal items, which was not witnessed by Jennifer. Instead, Jennifer and the State implied Bassett caused the damage because Jennifer had not seen similar damage prior to Bassett and Sokolowski's relationship. Similarly, Sokolowski's ex-husband testified that he observed bruising on Sokolowski that was not present prior to her dating Bassett. Such allegations could leave the jury to speculate whether Bassett was indeed the cause of the injuries simply based on the time-frame in which the injuries occurred. However, "various witnesses observed signs of physical abuse and given the context of these observations and the victim's well-documented fear of the defendant, we do not think the jury would have to speculate that [Sokolowski's] injuries were caused by [Bassett]." *See Newell*, 710 N.W.2d at 23.

Finally, we must examine whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Putnam*, 848 N.W.2d at 9. We consider factors such as "the need for the evidence in light of the issues and the other evidence available to the prosecution . . . and the degree to which the fact finder will be prompted to decide the case on an improper basis." *Id.* at 9-10 (citation omitted). Here, as described above, evidence of Bassett and Sokolowski's relationship was relevant to establishing intent and lack of accident. *See Taylor*, 689 N.W.2d at 130 (noting the need for such evidence to prevent the defendant from presenting "a false presentation that his and the victim's relationship and their parting were peaceful and friendly"). And, "[b]ecause intent is seldom proved by direct evidence, but rather is usually established by inference,

the circumstances" surrounding Sokolowski's death are "particularly important here." *See id.* at 129. This is particularly the case in which, as here, the only people present were the defendant and victim. *See State v. Richards*, 879 N.W.2d 140, 147 (Iowa 2016). We note the time between some events and Sokolowski's death. Domestic violence is frequently not limited to a single instance, but is instead a pattern of behavior. *See Taylor*, 689 N.W.2d at 128 n.6.

"We readily acknowledge juries would probably not like someone whom they conclude has repeatedly assaulted a significant other and therefore might develop a desire to punish." *Richards*, 879 N.W.2d at 152. However, the jury was instructed not to decide the case on improper considerations. *See id.* at 153 (noting that a limiting instruction curtailed the risk of unfair prejudice). Furthermore, the jury acquitted Bassett on the charge of first-degree murder, showing they were not reacting emotionally but instead focused on the elements of the offenses. Based on the record before us, we cannot say the evidence's probative value was substantially outweighed by the risk of unfair prejudice. The court did not abuse its discretion in admitting the evidence.

## III. Motion for Mistrial

Bassett appeals the denial of his motion for a new trial based on a statement one witness made about his history of burning Sokolowski's property. Shortly after the court sustained a hearsay objection involving Sokolowski informing the witness, "I hope that he doesn't beat me tonight," the witness stated that Sokolowski expressed "that she did not want her stuff burned again." During a prior discussion, the State had been instructed by the court not to solicit testimony

from that witness about the defendant burning Sokolowski's property. Bassett moved for a mistrial.

We review a court's ruling on a motion for mistrial for an abuse of discretion. *Newell*, 710 N.W.2d at 32. "A mistrial is appropriate when 'an impartial verdict cannot be reached' or the verdict 'would have to be reversed on appeal due to an obvious procedural error in the trial.'" *Id.* (citation omitted). "The pertinent question here is whether the court was clearly unreasonable in concluding an impartial verdict could be reached notwithstanding the witness's testimony." *Id.*

We determine the court did not abuse its discretion. First, the objected-to statements constituted two sentences of a trial that spanned six days and twenty-five witnesses. *See id.* (noting that an isolated incident weighs against mistrial). Moreover, the court instructed the jury to disregard both statements. *See id.* at 32-33 (explaining that the court admonishing the jury to ignore a statement is presumed to have been effective absent evidence to the contrary). And, as seen in the preceding section, other witnesses provided ample information about Bassett's history of domestic violence—both against Sokolowski's person and property—such that these two statements did not provide information the jury did not already possess. The court did not abuse its discretion when it denied the motion for mistrial.

## IV. Confrontation Clause

Bassett contends testimony from Woodbury County sheriff's deputies involving Sokolowski's statements to them after a fight with Bassett violated the Confrontation Clause. "We review constitutional questions de novo." *In re J.C.*, 877 N.W.2d 447, 451 (Iowa 2016) (citation omitted). The State bears the burden

of establishing the statements' admissibility under the Confrontation Clause. *See id.* at 452.

The Sixth Amendment, applied to the states via the Fourteenth Amendment, provides that criminal defendants "shall enjoy the right . . . to be confronted with the witnesses against him." The amendment "prohibits the introduction of testimonial statements by a nontestifying witness, unless that witness is 'unavailable to testify, and the defendant had had a prior opportunity for cross examination.'" *Ohio v. Clark*, 576 U.S. 237, 243 (2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 54 (2004)). Here, Sokolowski was unavailable, but Bassett never had a prior opportunity to cross-examine her. Thus, our inquiry turns to whether her statements were testimonial.

The Supreme Court has not established "an exhaustive definition" of what constitutes a testimonial statement. *Id.* However, one common example involves statements to police. The court explained,

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 244; *see also Davis v. Washington*, 547 U.S. 813, 822 (2006) (explaining that courts inquire as to the "primary purpose" of the statements to decide whether they were made during an emergency or in furtherance of a prosecution). To determine the primary purpose of the statements, "we objectively evaluate the circumstances in which the encounter occurs and the statements and actions of

the parties." *Michigan v. Bryant*, 562 U.S. 344, 359 (2011). Thus, we do not look at "the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained by the individuals' statements and actions and the circumstances in which the encounter occurred." *Id.* at 360.

As has been explained in other cases involving domestic violence, the circumstances of Sokolowski's statements were not an emergency. *See Davis*, 547 U.S. at 830. Sokolowski informed the deputies that her boyfriend had left the area, reducing the risk both to herself and the deputies. *See id.* There was also limited risk to the public, as "[d]omestic violence cases like *Davis* and [its companion case] *Hammon* often have a narrower zone of potential victims" than other crimes. *Bryant*, 562 U.S. at 363. Their questions were not about "'what is happening,' but rather 'what happened.'" *See Davis*, 547 U.S. at 830. Thus, her statements were not made in the context of an emergency.

That said, the lack of an emergency does not automatically render statements testimonial. "[W]hether an ongoing emergency exists is simply one factor . . . that informs the ultimate inquiry regarding the 'primary purpose' of the interrogation." *Clark*, 576 U.S. at 245 (quoting *Bryant*, 562 U.S. at 366). Other factors include the informality of the questioning. *Id.* "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'create an out-of-court substitute for trial testimony.'" *Id.* (citation omitted).

Sokolowski's encounter with the sheriff's deputies was informal—she accidentally ran into them while they were getting coffee at a gas station. She was

extremely reluctant to provide any relevant information other than that she and her boyfriend, who she refused to identify, had had a fight. Instead, her statements were limited to acquiring the deputies' assistance with collecting her property and obtaining a ride to a different location. Thus, Sokolowski's primary purpose for the statements was not to aid in Bassett's prosecution or create an out-of-court substitute for her testimony. Instead, it was limited to exiting the area. Her statements to the sheriff's deputies were not testimonial, and the district court properly admitted them at trial.

But even if we determined Sokolowski's statements were testimonial, any error of their admission would be harmless. The officers would still have been able to testify that they determined Bassett was the perpetrator of the assault based on the observation of hotel surveillance video. Bassett admitted he was the perpetrator and entered a guilty plea to the offense of domestic abuse assault. The prior incident of domestic abuse was established by other evidence—not by Sokolowski's statements that her boyfriend, whom she refused to identify, had kicked her, that she wanted to get a ride to Sioux City, and her refusal to show her leg to the officers.

## V.     Medical Examiner Testimony

Bassett contests the admissibility of some of Dr. Catellier's testimony as it related to information she obtained from law enforcement and Sokolowski's friends and family concerning the history of suffering from domestic violence.[2]     In

---

[2] Bassett does not contest all of Dr. Catellier's testimony. For instance, Bassett does not challenge her testimony related to Sokolowski's cause or manner of death.

particular, Bassett claims that Dr. Catellier's use of such statements means her final conclusions were not supported by specialized knowledge, thus violating Iowa Rule of Evidence 5.702. We review evidentiary objections for an abuse of discretion. *State v. Tyler*, 867 N.W.2d 136, 153 (Iowa 2015).

As a preliminary matter, we must decide whether Bassett's claim is preserved. The State claims the district court never made a final ruling on the issue of Dr. Catellier's testimony and report. Prior to trial, Bassett filed a motion in limine seeking, among other things, to exclude Dr. Catellier's testimony and report as violating Iowa Rule of Evidence 5.702. The district court denied that portion of the motion. The court's ruling appears to use final language. For instance, the court stated, "The Court FINDS that the medical report issued by Doctor Catellier in this case is well within the holdings of the *Tyler* case. . . . The court denies the defense motion in limine on this issue."[3] Similarly, the court found Dr. Catellier's report would not constitute hearsay, and "that the defense motion in limine should be denied on this issue." The final nature of the court's ruling is evident when compared to other portions of its ruling. For example, on the issue of prior bad acts, the court concludes by merely noting, "[T]he Court will not grant the motion in limine at this time as to any such evidence. Rather, the Court will treat the

---

[3] While the ruling related to Dr. Catellier's testimony, rather than her report, was slightly less clear, the district court noted directly after finding the report admissible that "[t]he Court assumes the medical examiner will testify at trial." Given the context of the ruling—particularly the court including Dr. Catellier's testimony as a piece of evidence being considered in tandem with her report for the majority of its analysis—we find the court's order would usually be sufficiently final to preserve error on Dr. Catellier's testimony. *See State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005) ("[W]e recognize an exception to the general error-preservation rule when the record indicates that the grounds for the motion were obvious and understood by the trial court and counsel.").

motion in limine as a cautionary statement." The court's apparent final ruling on the motion in limine would ordinarily preserve Bassett's claims for appeal despite the lack of objections at trial. *See State v. Alberts*, 722 N.W.2d 402, 406 (Iowa 2006).

The wrinkle comes from the court's treatment of objections to Dr. Catellier's report at trial. The district court sustained a hearsay objection when the State offered Dr. Catellier's report, contradicting its previous ruling on the matter. This would indicate that the initial ruling was not final. But Bassett never specifically objected at trial to Dr. Catellier's testimony. As asserted by the State, it is unclear on appeal what specific portions of Dr. Catellier's testimony Bassett is contesting. Without any final ruling on the matter of Dr. Catellier's testimony and the lack of timely objections at trial, we may determine Bassett's claim is unpreserved. *See Buboltz v. Birusingh*, 962 N.W.2d 747, 757 (Iowa 2021) ("To preserve error on an objection to the admission of evidence at trial, counsel must make known a specific objection to give the trial court an opportunity to rule on the objection and correct any error"); *State v. Tangie*, 616 N.W.2d 564, 569 (Iowa 2000) (noting that a motion in limine is final and preserves error only when "it is beyond question whether or not the challenged evidence will be admitted during trial").

But even if we were to consider the issue preserved and address the merits of Basset's argument, we find that the testimony of the medical examiner was properly admitted. Both parties agree the fighting issue involves whether Dr. Catellier's testimony exceeded the scope of expert testimony, as explained in *State v. Tyler.* In *Tyler*, the medical examiner was unable to rule that the death of an infant was a homicide based on the evidence obtained by the autopsy because

such evidence was equally indicative of multiple causes of death.[4]  867 N.W.2d at 149.  However, the medical examiner ultimately ruled the manner of death was homicide.  *Id.*  That decision was "based entirely" on the belief that the defendant's statements to police were true.  *Id.* at 150.  Our supreme court held that while medical examiners "routinely rely on circumstances that surround the death, as revealed by independent investigation, police investigation, and eyewitness accounts," such reliance impermissibly took the examiner's findings outside the realm of expert testimony when they base their findings "largely" on witness statements rather than scientific results like autopsies.  *Id.* at 155, 162.  The court highlighted that there was no "bright-line rule" for determining the limits of reliance on lay witness reports, and that the issue "depends on the particular circumstances of each case."  *Id.* at 162.  Thus, in *Tyler*, the court found the medical examiner's wholesale reliance on the defendant's statements to rule the death a homicide took the testimony outside that of an expert and should have been excluded.  *Id.* at 163.

We distinguish this case from *Tyler.*  Unlike that case, Dr. Catellier primarily based her results on the autopsy.  That autopsy found nonspecific injuries consistent with strangulation, including florid petechia and a hemorrhage to her right carotid artery.  However, such findings were insufficient for her to rule the death as a homicide within a reasonable degree of medical certainty.  Thus, as medical examiners routinely do, she spoke with friends, family, law enforcement, and first responders to ascertain what treatments were performed at the scene and discover further relevant details.  But in marked contrast to *Tyler*, the information

---

[4] The defense alleged the child was stillborn, while the State argued the child was drowned by their mother.  *Tyler*, 867 N.W.2d at 150.

she obtained from those conversations did not change her conclusion—the manner of death remained undetermined. Thus, her findings rely primarily on the autopsy results: some injuries were consistent with homicide, which gave Dr. Catellier her initial suspicion of foul-play, but ultimately there was not enough physical evidence of strangulation to rule the manner of death as homicide.

Furthermore, Dr. Catellier's references to obtaining information from police, friends, and family did not comment on their credibility. *See id.* at 166 (noting that expert witnesses cannot comment directly or indirectly on other witness's credibility). In *Tyler*, the medical examiner's ruling on manner of death necessarily implied they found the defendant's statements to police credible—without them, the medical examiner could not determine the manner of death. *See id.* at 150. However, Dr. Catellier's references to the information she obtained was generally limited to noting a "history of domestic violence." Such is not enough to pass a credibility determination on any specific witness. Indeed, Bassett pled guilty to domestic abuse causing bodily injury and had an active NCO in place prohibiting contact with Sokolowski—it did not require believing *any* of the witnesses to make the finding Sokolowski had a history of domestic violence. Thus, Dr. Catellier's testimony did not exceed the bounds of appropriate expert testimony, and the court properly admitted it.

## VI.    Law Enforcement Interview

Bassett claims the district court should have suppressed parts of his interview with DCI agents because he had not been *Mirandized* when he made

them.[5]  "We review determinations of whether to suppress both evidence obtained and statements made in violation of constitutional guarantees de novo."  *Id.* at 152. We evaluate the totality of the circumstances, considering evidence introduced at the suppression hearing and at trial.  *Id.*  We give deference to credibility determinations made by the district court, but are not bound by them.  *Id.*

A failure to provide *Miranda* warnings will only warrant suppression of defendant's statements when they were made during a custodial interrogation.  *Id.* at 171.  The only issue on appeal is whether Bassett was in custody during the questioning.  "A suspect is in custody if the 'suspect's freedom of action is curtailed to a degree associated with formal arrest.'"  *State v. Bogan*, 774 N.W.2d 676, 680 (Iowa 2009) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).  Put another way, "we examine the extent of the restraints placed on the suspect during the interrogation in light of whether 'a reasonable man in the suspect's position would have understood his situation' to be one of custody."  *Tyler*, 867 N.W.2d at 172 (citation omitted).  Such determination depends on objective circumstances surrounding the interrogation, not the subjective beliefs of the defendant or officers. *Bogan*, 774 N.W.2d at 680.  We consider: "(1) the language used to summon the individual; (2) the purpose, place, and manner of interrogation; (3) the extent to which the defendant is confronted with evidence of [his] guilt; and (4) whether the defendant is free to leave the place of questioning."  *Id.* (quoting *State v. Countryman*, 572 N.W.2d 553, 557 (Iowa 1997)).

---

[5] While the entire interview lasted over four hours, Bassett only seeks to suppress about an hour of the interview.

We first examine the language used to summon Bassett. Agent Schalk, the DCI agent who conducted the interview, testified that he called Bassett and asked if he would be willing to talk with him. Bassett responded that he would be willing to speak, but needed to obtain a cab because he was in Missouri. Schalk called Bassett again and offered to provide Bassett a ride and emphasized that "I just appreciate you being willing to talk to me." Bassett responded, "I don't have a problem with talking to you." Bassett ultimately arrived at his father's home across the street from the police department and city hall, after which another DCI agent who was interviewing Bassett's father and step-mother walked with him to meet Schalk in city hall. There is no indication Bassett was reluctant to talk with the officers, nor is there any evidence that he tried to decline the request. As such, this factor suggests *Miranda* warnings were unnecessary. *See State v. Schlitter*, 881 N.W.2d 380, 396 (Iowa 2016) abrogated on other grounds by *State v. Crawford*, 972 N.W.2d 189, 197-98 (Iowa 2022).

We next consider the purpose, place, and manner of the interrogation. When considering this factor, "we examine factors including the number of persons conducting the questioning, the number of breaks taken during the questioning, the availability of restroom breaks or other breaks, and the type of questioning in which those conducting the interview engage." *Tyler*, 867 N.W.2d at 172-73. Testimony revealed two main purposes for the interview: (1) to obtain information from Bassett about the events because he was the primary suspect, and (2) locate Bassett so DCI agents could execute a search warrant.

The interview was conducted in an office space within city hall, which was adjacent to, but separate from, the police department. City hall was also located

across the street from Bassett's father's home. While not exactly "home turf" for either the officers or Bassett, it was a relatively neutral location situated nearby the comforts of Bassett's family. The interview was conducted in an office space, with Schalk located behind a table and Bassett near the open door. Thus, Bassett was not physically confined. *Cf. Schlitter*, 881 N.W.2d at 396 (noting that an officer placed between the defendant and the door was indicative of applying pressure against the defendant).

Bassett was never physically controlled by handcuffs or similar restraints. Schalk was the only officer visibly present and was dressed in plain clothes. *See Tyler*, 867 N.W.2d at 173. And while the interview was lengthy and conducted at night, the room was well lit and drinks were offered to the defendant. *See id.* (noting that a three-hour interview does not necessarily mean the defendant was in custody, and highlighting the physical environment as a relevant factor). Bassett took two breaks to smoke or use the restroom, during both of which he was left alone. Most of the interview was open-ended questions, although Schalk conceded that portions of the interview were more confrontational. *See id.* (quoting *Countryman*, 572 N.W.2d at 558) (noting that open-ended questions weigh against a finding of custody). Even during the portions when Schalk suggests Bassett is lying, Schalk's tone is calm. *See id..* The purpose, place, and manner of the interview suggests Bassett was not in custody.

Third, we look to whether Bassett was presented with evidence of his guilt. The first two hours of the interview were largely open-ended questions and background information. But during the so-called "challenge portion" of the interview—the portion Bassett is seeking to suppress—the overall tone became

more accusatory. Schalk repeatedly informed Bassett that he did not believe him, and implied that evidence existed that suggested his guilt. For instance, Schalk informed Bassett that the investigation was concluded, and the case facts show Bassett was responsible. Similarly, Schalk told Bassett several times that the case facts, including phone messages and the autopsy report, did not match what Bassett was saying. While Schalk rarely confronted Bassett with specific pieces of evidence suggesting he was guilty, the questioning was highly accusatory. *See Schlitter*, 881 N.W.2d at 398. In particular, informing a defendant that the investigation was concluded and showed he was responsible would cause a reasonable person to suspect they were not free to leave. Thus, this factor suggests Bassett was in custody.

Finally, we must examine whether Bassett was free to leave. Schalk informed Bassett that he was not under arrest and was free to leave at the beginning of the interview and again a little after three hours into the interview. *See Tyler*, 867 N.W.2d at 174 (noting that informing the defendant they are free to leave is the most effective means of showing they were not in custody). While Bassett argues he did not believe the officer, his subjective beliefs are not relevant to our review. *See Bogan*, 774 N.W.2d at 680. Bassett was never restrained, had free access to an open door, and was allowed to leave the interview room unaccompanied during breaks. He was not dependent on officers to drive him home, as his father lived across the street and he had taken a cab to get there from Missouri. *See Schlitter*, 881 N.W.2d at 397. And the interview ended once Bassett indicated he was done talking with Schalk.

Given the totality of the circumstances, we find Bassett was not in custody. He arrived at the city hall, a neutral location, on his own initiative, was told he could leave at any time, and did in fact leave on his own on two separate occasions. While the interview itself was somewhat accusatory and Schalk presented—or implied—some evidence of Bassett's guilt, Bassett's complete freedom of movement during the interview shows a reasonable person would not have believed they were restrained to the degree of a formal arrest. The district court properly denied the motion to suppress.

## VII. Sufficiency of the Evidence

Bassett contests the sufficiency of the evidence. He claims there was insufficient evidence to establish he assaulted Sokolowski or that he acted with malice aforethought. We review claims involving the sufficiency of the evidence for correction of errors at law. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). We view the evidence "in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence." *Id.* (citation omitted). We will uphold the verdict if it is supported by substantial evidence. *Id.* Evidence is substantial when it could convince a rational trier of fact that the defendant is guilty beyond a reasonable doubt. *Id.*

In order to convict Bassett of second-degree murder, the jury must have found: "(1) On or about September 22, 2018, Zachery Bassett assaulted Andrea Sokolowski. (2) Andrea Sokolowski died as a result of being assaulted. (3) Zachery Bassett acted with malice aforethought." The jury was instructed that "'[m]alice aforethought' is a fixed purpose or design to do some physical harm to

another which exists before the act is committed. It does not have to exist for any particular length of time."[6]

Substantial evidence supports Bassett's conviction. First, the medical examiner testified about purpling on Sokolowski's finger nails that indicated they had been forcefully bent backwards. She also testified about florid petechia, which are caused by increased pressure in capillaries, as well as a hemorrhage around the right carotid artery. The florid petechia were also found in unusual places such as Sokolowski's mouth, indicating significant pressure was applied. Those injuries are consistent with strangulation and a struggle by Sokolowski. The nurse practitioner who treated Sokolowski testified that her airway was the most swollen of anyone he had ever treated. He further testified that the most common reason for a closed airway is trauma or allergies. Thus, a reasonable juror could find the medical testimony supported the State's claim that Bassett assaulted Sokolowski.

While the defense presented some evidence that the injuries could have been caused by medical intervention or positional asphyxiation, and that some injuries common to strangulation were not present, the jury was free to credit some witnesses over others. *See State v. Liggins*, 557 N.W.2d 263, 269 (Iowa 1996). Both paramedics testified about the medical interventions they attempted and the manner they conducted them. The medical examiner testified that strangulation can cause many different injuries, it is not uncommon for some potential injuries to be lacking in any given strangulation, and that one must examine all of them

---

[6] Neither party challenges the validity of the jury instructions.

together to determine the cause of death. Thus, the absence of some injuries was not fatal to the State's case.

The jury's decision to credit some testimony over Basset's version of events is particularly understandable because the defense's theory had deficiencies. For instance, the defense's own expert witness testified that a person would not instantly lose consciousness from positional asphyxiation, as Bassett claimed happened. The defense also could not explain why Sokolowski's pants were saturated and her bladder was empty—the emptying of bowels is common in the moments prior to death—and that her pants were buttoned up when paramedics arrived, in contradiction of Bassett's claim that he was removing her pants when she lost consciousness. And Bassett's changing story as events transpired undermined the credibility of his claims. In particular, it is telling that Bassett provided what he concedes was a false story to emergency responders—one would think someone who witnessed an accidental death would want to provide accurate information to medical personnel to ensure proper treatment. *Cf. State v. Smith*, 876 N.W.2d 180, 185 (Iowa 2016) (noting that the reason for the medical diagnosis exception to hearsay is that "the effectiveness of the medical treatment rests on the accuracy of the information imparted to the doctor [and] [a] patient understands that a false statement in a diagnostic context could result in misdiagnosis").

We also note that Bassett's history of domestic violence demonstrated he responded violently to Sokolowski in the past. That history was relevant for the jury to infer he would respond violently in similar circumstances involving Sokolowski, providing evidence of his intent and the lack of an accident. *See*

*Taylor*, 689 N.W.2d at 125. Testimony indicated Sokolowski was planning to separate from Bassett, which angered him. The jury could reasonably infer from his prior conduct that he would respond violently, as he had done in the past. Thus, sufficient evidence exists establishing Bassett assaulted Sokolowski with malice aforethought.

## VIII. Juror Misconduct

Bassett contends he is entitled to a new trial based on juror misconduct. Following trial, three jurors submitted affidavits that indicated one juror had attempted an experiment at home. That experiment involved the juror attempting to be held in the position Bassett claimed Sokolowski was in when she died. During deliberations, while multiple conversations were going on, the juror informed other jurors about her experiment. Two jurors submitted affidavits that indicated the foreperson quickly redirected the conversation. The conversation "lasted only seconds."

We review a motion for a new trial based on jury misconduct for an abuse of discretion. *State v. Sauls*, 391 N.W.2d 239, 240 (Iowa 1986), abrogated on other grounds by *Ryan v. Arneson*, 422 N.W.2d 491, 495 (Iowa 1988). We utilize a three-part test to determine whether juror misconduct warrants a new trial:

> First, the evidence from the jurors must consist only of objective facts as to what actually occurred in or out of the jury room bearing on misconduct. Second, the acts or statements complained of must exceed tolerable bounds of jury deliberation by constituting jury misconduct. Third, and finally, it must appear the misconduct was calculated to, and it is reasonably probable it did, influence the verdict.

*Id.* at 241 (citing *State v. Cullen*, 357 N.W.2d 24, 27 (Iowa 1984)).

Based on the affidavits submitted to the court, objective facts indicate a juror conducted an experiment and informed at least some other jurors about the results. *See Sauls*, 391 N.W.2d at 242 (noting that affidavits can be used to satisfy the first element of the *Cullen* test). Experiments conducted by jurors introduces new evidence not before the court. As such, it exceeds the tolerable bounds of jury deliberation. *See id.*

"However, this does not necessarily entitle [the defendant] to a new trial." *Id.* Instead, it must be established that there is a reasonable probability the conduct influenced the verdict. While this prong is difficult to satisfy, some factors are relevant here. First, experiments within the realm of common experience, rather than those which require measurements or technical skills, tend not to require reversal. *Id.* (collecting cases). The ultimate issue of Sokolowski's cause of death required expertise—two expert witnesses testified and came to somewhat different conclusions—but the experiment and information obtained related to common experiences. Jurors understand from their own experience when it is difficult to breath. Moreover, the juror did not obtain new information; if the juror thought the position could produce the results Bassett claimed, they logically would not have attempted the experiment because it would have nearly immediately killed them. And the two expert witnesses had testified that Sokolowski could not have died in the time-frame Bassett suggested. *See id.* at 242 (noting that evidence in the record already demonstrated what the juror attempted, reducing need for new trial). Finally, while only one juror needs to be influenced in order to require reversal, *see State v. Christensen*, 929 N.W.2d 646, 679 (Iowa 2019), the short time-frame involved here and quick redirection by the foreperson limited the

risk of jurors being influenced by the experiment.[7]  *See State v. Smith*, 573 N.W.2d 14, 18 (Iowa 1997).  The juror informed other jurors about the experiment while multiple conversations were happening and lasted "only seconds."  Thus, the risk of other jurors being influenced was greatly reduced.

Given the limited nature of the information gained by the juror and those they spoke with about the experiment, as well as the ample evidence disproving Bassett's version of events, the court did not abuse its discretion in denying the motion for a new trial.

**IX.  Conclusion**

Finding no reversible error, we affirm Bassett's conviction.

**AFFIRMED.**

---

[7] We note that the experimenting juror's affidavit indicated that it had "at least partially influenced their verdict." However, affidavits cannot be used to demonstrate the influence of improper evidence.  *See Christensen*, 929 N.W.2d at 679.